

Home | Contact Us | Site I

About AFGE | News, Media Publications | Member Benefits & Resources | Government Wide Issues | Agencies | Education & Organizing | Legislation & Politics | R

## MEMBER BENEFITS & RESOURCES

Home > Member Benefits & Resources >

MEMBER BENEFITS

EVENT CALENDAR

HOW-TO

RETIREES

NST - FINANCIAL OFFICER RESOURCES

CASETRACK

COLLECTIVE BARGAINING

FIND ELECTED OFFICIALS

MEMBER RESOURCES

AFGE STAFF RESOURCES

# Benefits for AFGE Members

When you join the union, you have access to these AFGE benefits. These ber backed by the collective strength of over 10-million members of AFL-CIO uni using one or two of the programs, many members save as much as their ani dues.

**These Money-Saving Benefits are Available Only to AFGE Members:**

## Legal

### Legal Services Program

No enrollment forms or fees are required. AFGE members are automatically enrolled and are entitled to the following benefits for each separate legal matter:

-  A free initial consultation with a lawyer of up to 30 minutes (in person or over the phone),
- A free simple document review and explanation
- A free follow-up letter or phone call, if likely to resolve a legal matter.
- Most additional services are discounted by 30% (including attorney's hourly rates and flat fees for most common legal cases.

### Your Legal Health

Are you legally healthy? "What?" "I guess so." "How would I know?" Chances are your answer to a question about your legal health would be some variation of these.

### Small Claims Court

About three quarters of the plai in small claims court win. You sl consider small claims court as o way to "right wrongs."

### Warranties

When I buy something, is covered by a warranty?

How long does a warranty

Do I have any recourse if t item breaks after the warr expires?

I just bought a stereo syst and the salesclerk tried to me an extended warranty contract. Should I have bo the contract?



**American Federation of Government Employees**
**Local 2978 – District 14**
District of Columbia Government
Department of Health

717 14th Street NW
Suite 950~Box 14
Washington, DC 20005
Phone 202.727.9854/65
Fax 202.727.4934
Email anicejo@hotmail.com

JoAnn McCarthy
*President*

Mary A. Brawner
*Advisor to the President*

Deidre Sparrow
*Vice President*

Deontrinese Henderson
*Chief Shop Steward*

Ida Shade
*Treasurer*

Jennifer M. Johnson
*Secretary*

Andrea Champ
*Sergeant of Arms*

Yvonne Jackson
*Fair Practice Coordinator*

Andrea Champ
*Women's Coordinator*

Delegates
Deidre Sparrow
Yvonne Jackson
Jennifer Johnson
Deontrinese Henderson

Administrations Represented

Environmental Health
Public Health Laboratory
Lead Poisoning Prevention

Maternal & Child Health

Nutrition Programs (CSFP) & (WIC)

Preventive Health Services
Chronic Disease
Communicable Disease
Epidemiology & Health Risk Assessment

January 15, 2004

James F. Buford, Director
Office of the Director
Department of Health
District of Columbia Government
825 North Capitol Street NE
Washington, DC 20002

Dear Mr. Buford:

For some time now, we have brought to you matters that were affecting our membership in a negative way. We have made many attempts to amenably resolve pending issues to no avail. It seems as though frontline employee concerns are not taken seriously. There is a definite resistant to labor/management cooperation which I cannot understand because cooperative relationships foster better production, better services and accomplishes goals/objectives.

The Occupational Safety and Health Notice (OSHN-DOH-10-08-2003) informing you of serious conditions related to fear of potential workplace violence at 717 14th Street, NW was issued on October 10, 2003. You responded almost a month later on November 3, 2003 regarding an issue that you were already aware of and should have been trying to circumvent. Instead, you assigned the Chief of Staff, Phyllis Mayo as the lead team member for the investigative team that should have been under the guidance of the Office of Risk Management.

Not only is Dr. Mayo out of touch with employees, most employees don't even know who she is because she was not introduced to them. Dr. Mayo's obvious attitude towards employees was very apparent by the comments we received from our members, like, *Dr. Mayo is not for us, she's political, and she only wants to protect management.*

*Dr. Mayo's report was bias and inaccurate plus she included as attachments documents about me, the Union President that were irrelevant to the subject matter and detrimental to me regarding my character and my ability to represent or protect employees in our Unit.* In your letter responding to OSHA's Alert, you stated that *the general consensus is that there is a perceived and/or real threat of violence at the location. Whether perceived or real, this is not a situation the Department of Health will tolerate for its employees.* But to this date, nothing has been done to supply staff members with any relief.

Because the Department refused to resolve this matter, in order to relieve the undue suffering and mental stress of employees, the chair and telephone was removed from the credenza next to Ms. Evans' desk. *Now removal of a chair that could have easily been replaced by simply placing the missing chair is now a program issue.*

*The Department left us no alternative but to try to do something that would give relief to affected employees.* This chair was actually placed there by Ms. Evans herself long before Mr. Health decided to move Mr. Jackson to the 9th floor. He responded to the requests of direct assignees that refused to come to work if Mr. Jackson's workplace was still located on their floor.

We are positive that if Mr. Heath had used good judgment, met with employees to discuss the problem and solicited their opinions, an amenable solution could have been agreed upon. But he did not do this because he is protecting Mr. Jackson and condones his behavior.

Instead of handling this situation appropriately, Mr. Jackson was moved to the 9th floor where female staff were also located and who feel just as threatened by his behavior as those on the 7th floor. This was not a viable solution since it did not resolve the pressing issue. DPM regulations were ignored by not following Chapter 16's (1617.1, 2, 3 & 4) guidelines for summary removal which states:

1617.1    An agency head may remove an employee summarily when the employee's conduct:

a)       Threatens the integrity of government operations;
b)       Constitutes an immediate hazard to the agency, to other District employees, or
c)       Is detrimental to public health, safety, or welfare.

1617.2  An employee who is notified by written or oral directive of a summary removal from his or her position pursuant to this section shall immediately leave his or her duty station and/or District government facility.

None of this happened. In fact, Mr. Jackson was placed on Administrative Leave and given a two (2) week vacation.

★ Now, Colleen Crowley, Assistant Program Manager [federal direct assignee, CDC] recently hired by John Heath asked me to return a chair back to it's original space so Mr. Jackson can perform his duties on Tuesday, 01/13/04. *[He is not coming to work because he does not have a chair to sit on to do his job.]* She also asked Ms. Evans, Administrative Officer to give her the master key so she could enter the union office to retrieve a chair. *This would have been a BIG mistake which the Department would have been held accountable.*

We feel priorities are misplaced concerning employee safety. We also feel, if indeed, Mr. Jackson is not coming to work because of his need to have a chair, he has in fact abandoned his position and there are DPM regulations on how to handle this type of employee insubordination.

• We do not understand Ms. Crowley's interference in Union business. She is not within our chain of command, nor is she even aware of the situation in order to make intelligent reasonable request. Therefore, we are asking that you intercede in order to prevent any additional problems that will definitely arise if this situation continues in this manner.

I will not be subjected to levels of management involvement that are not legally accountable or capable of addressing Union issues. Please inform management [Dr. Berry, Bureau Chief and John Heath, Program Manager, STD] the appropriate manner in which to handle this situation.

We await your immediate response. If you, the Department, choose to ignore this issue, as it has in the past, it will leave us no alternative but to seek legal remedies immediately.    Therefore we are requesting an immediate response to this correspondence. If for some reason, you cannot respond, please contact me ASAP so we will not await a response.

Sincerely yours,

JoAnn McCarthy
President

Attachment: Memo from C.Crowley, Assistant Program Manager, Regarding Removal of Chair

Cc: A.Willliams, J.Williams, E.Bunn



American Federation of Government Employees
Local 2978 – District 14
Affiliated with AFL/CIO
District of Columbia Government
Department of Health



717 14th Street NW
Suite 950~Box 14
Washington, DC 20005
Phone
202.727.9854/65
Fax  202.727.4934
Email
anicejo@hotmail.com


JoAnn McCarthy
President

Mary A. Brawner
Advisor to the President

Deidre Sparrow
Vice President

Deontrinese Henderson
Chief Shop Steward

Ida Shade
Treasurer

Jennifer M. Johnson
Secretary

Andrea Champ
Sergeant of Arms

Yvonne Jackson
Fair Practice Coordinator

Andrea Champ
Women's Coordinator


Delegates
Deidre Sparrow
Yvonne Jackson
Jennifer Johnson
Deontrinese Henderson


Administrations
Represented

Environmental Health
Public Health Laboratory
Lead Poisoning
Prevention

Maternal & Child Health

Nutrition Programs
(CSFP) & (WIC)

Preventive Health
Services
Chronic Disease
Communicable Disease
Epidemiology & Health
Risk Assessment

December 31, 2003

Honorable Anthony A.  Williams
Mayor
District of Columbia
1350 Pennsylvania Avenue, N.W.
Washington, DC  20005

Dear Mayor Williams:

As a representative for some of my union members in Local 2978, that are located within the Bureau of Communicable Diseases, STD Control Program, Administrative Office, located  at 717 14th Street, N.W., Room 950, I would like to again request an investigation into the potential for work place violence.  It is my understanding that one complaint of fear of workplace violence is sufficient to warrant an investigation on the part of management, whether the threat is perceived or has actually taken place verbally or physically.   Previously, I e-mailed your office regarding the Department of Health's (the Department) refusal to address this matter seriously explaining that employee safety and well being was not a priority with the District of Columbia Government. .

· Based on my contacting the Office of Risk Management, John Dougan and Sandra Marley made an impromptu site visit to interview female employees who felt threatened by a male employee's behavior.   ORM requested the Department to conduct an investigation which did not take place.   Mr. Dougan found out during a subsequent call from me that this investigation did not take place.  On October 10, 2003, ORM had to issue an Occupational Safety and Health Alert Notice due to the failure of the Department to conduct this investigation thereby forcing one.

ORM's recommendation was to investigate fully the complaints coming from our STD's Administrative Office. November 17th employees at STD Control's Administrative Offices were told they were requested to speak with representatives from the Director's office about their positions and related concerns. These interviews were broken down into days. Some of the staff members were asked about Mr. Dale Jackson, Motor Vehicle Driver who was the male staff member exhibiting threatening and ill rational behavior, along with questions about their working conditions. (Mr. Jackson's behavior has been an issue here as well as the sites he visits to pick up reports, such as Howard University, Planned Parenthood and also at our own payroll office, where he frightened payroll staff in reference to his leave status (Ms. Ross and Ms. Brown).

A request for an investigation is being made again to your office, because nothing has changed from our request to the Risk Management Team, with the exception of the interviews done by Dr. Phyllis Mayor, Chief of Staff for DOH, Julian K. Tolver, Risk Manager and Tracy Martin, Program Analyst for Health Promotion, referred to as Management Investigation Team (MIT). Dr. Phyllis Mayo served as team leader.

The information given to the MIT from the STD Control employees about the potential for work place violence was basically dismissed by MIT as being erroneous statements on our part. Even after we informed MIT that Mr. Jackson was not disciplined during his first episode of violence in the workplace, MIT went on to say that he was disciplined. Now an anonymous letter that was sent to the Inspector General's office has been breeched and given to Mr. Jackson, concerning the possibility of him committing fraud by working at the DC Government as an MVO and working during the same hours at another job. While this was submitted to be investigated by the Inspector General's office, Management was conspiring together to protect him by any means. Even to the point of pointing the finger at the accusers saying that it was all erroneous and of coming to a conclusion that should have been done by the Inspector General's Office which claims assurance of privacy and confidentiality in reporting waste, fraud and abuse.

-3-

\* At this point, it seems that the Senior Managers at the Department of Health are trying to cover up something, I just don't know what. If we could get an honest investigation from unbiased individuals for the employees at the STD Control Program, I would be most grateful.

I am enclosing some of the correspondence from that Investigation conducted by the MIT. Documents that personally attacked my position as Union President, my integrity, my professionalism and my efforts to protect and represent AFGE Local 2978's members have not been included. I question the purpose of these documents inclusion into this report because they are irrelevant to this issue and my legal representative has been contacted. Further communication forthcoming regarding this issue.

If you require additional information, please feel free to have a member of your staff contact me on 727-9865 or Union Office number, 727-9854.

Sincerely,


JoAnn McCarthy
President

December 30, 2003

Honorable Anthony A. Williams, Mayor
District of Columbia Government
1350 Pennsylvania Avenue NW
Washington, DC 20005

Dear Honorable Mayor Williams:

I am profoundly astounded by the conduct of managers, hired to head agencies that deliver crucial services, like the Department of Health, [the Agency] who have been appointed by you as leader and caretaker of the District of Columbia. My experience working for the District of Columbia Government has been a disappointment like it has been for many of the employees I represent as President of the American Federation of Government Employees Local 2978.

Some of us worked long and hard to establish labor/management cooperation within the Agency but since Dr. Walks and Ms. Keitt left, it does not exist. Everything has to be converted to a grievance or arbitration. The Agency's record of grievances resolved, at this point, is probably reversed, Where we had eighty percent (80%) of grievances resolved [closer to ninety-five (95%) for those who actually lived it] that figure probably has increased by twenty (20%) but only reversed. Now, its more like ninety-eight percent (98%) unresolved. Partnership does not exist within the Department of Health.

I am a chartered member of DOH's Partnership Council and participated as the Labor Co-Chair along with Rosalind Keitt who was Management's Co-Chair. Our partnership started out with Labor and Management sitting across the table from each other into one you could not tell who was who. Only after we started talking about issues could you tell who was labor and who was management. But this was only because the head of the Agency actually bought into the partnership concept. He didn't give managers the options to not participant in an activity that would strengthen the Agency by strengthen labor/management relations.

Example #2:  *Not all managers had their heart in it, like Rochetta Webb at Supplemental food who you could tell did not buy into the partnership concept by her body language and participation. You can tell Ms. Webb did not buy in by the way she handled our concerns about Miya Morales who is the community outreach worker at Adams Morgan. She did not have a working phone, no computer, no fax machine, no copier and at the charity of a private concern uses their equipment when needed. She even creates her own brochures and hand carries them to distribute them.*

*Instead of Ms. Webb correcting Ms. Morales situation, she ganged up on Ms. Morales [who by the way is Hispanic] with other individuals, frightening her more than she already was by asking her why she contacted the Union. One of our other members had been trying to persuade her to come to the Union with her concerns but she was afraid she would loose her job, just like a lot of the employees working for the Agency with various programs. Ms. Morales has received many, many, letters of accommodations from the clients she serves. She provides vital services to the Hispanic residents in Adams Morgan but Supplemental Food does not appreciate or award her for all her efforts. Just leaves her out there by herself without any real support. She does not deserve that. She deserves a deceit livable salary with benefits and all the tools/equipment she needs to perform her duties even more efficient than she already does without the proper materials.*

I stepped down from being Co-Chair after I realized that Dr. Walks' and Ms. Keitt's greatest fear in leaving the Agency was that it would revert back to the old adversarial ways of dealing with employee concerns and issues indeed did return. After all my years in trying to establish working cooperative relations within the Agency, to have it all dissipate so quickly, my heart is heavy.

*Example #2:  A public health advisor who was hired to perform as the foodborne coordinator.  This individual was terminated two (2) days before her probationary period was to end.  She had the particular knowledge, qualifications and experience to perform these duties but because she raised an issue concerning the budget she was let go.  She was so happy when she found out she was to be offered this position.  She left District Service not understanding how someone committed to investigating and finding the source of food borne pathogens could have been so mistreated, especially when she was versed in regulations and procedures concerning foodborne illnesses.*

*She was the Asian Pacific Islander the Agency used to meet your diversity criteria.  She was included in the Agency's report.  This individual also had her orientation approximately, two months before she was terminated.  I have not named her because we filed a grievance [which was ignored], invoked arbitration and settled before arbitration because the individual was too mentally stressed out.  Since she had never been terminated from a job before, she was devastated.  She was let go without cause all because she asked a simple question about where the check was for her equipment.  And as far as I know, no one has been hired to take her place.  She was let go at the same time President Bush declared war.  Makes you really wonder exactly what are our City's priorities.*

This is how qualified, knowledgeable, and committed employees to the District of Columbia Government are treated.  I think she was  discriminated  against but I  know  that's  illegal  and

representatives of the District Columbia Government wouldn't conduct themselves in that manner.

In meeting the needs of residents and visitors, [individuals who provide these vital services], *the employees, are sexually harassed, unfairly treated, abused, retaliated against, denied career ladder/promotions, verbally/physically threatened, denied training [even training pertinent to the performance of their duties or certifications] while trying to perform the duties for which they were hired.*

As representative of our members, I instituted an investigation regarding the potential of workplace violence within the Bureau of STD Control Program, 717 14th Street NW ~ Suite 750 & 950. It is my understanding that one complaint of fear of workplace violence is sufficient to warrant an investigation on the part of management, whether the threat is perceived or has actually taken place verbally or physically.  I emailed you previously regarding the Agency's refusal to address this matter seriously explaining that employee safety and wellbeing was not a priority with the District Government particularly, the Department of Health [See Section , Page  of AFGE Booklet }.

Based on my contacting, the Office of Risk Management John Dougan and Sandra Marley made an impromptu site visit to interview female employees who felt threatened by a male employee's behavior. ORM requested the Agency to conduct an investigation which did not take place [See ORM DOH Investigation Section  of Booklet,m   Pages in Chronological order, please].  Mr. Dougan found out during a subsequent call from me, that this investigation did not take place. On October 10, 2003, ORM had to issue a Occupational Safety and Health Notice due to the failure of the Department to conduct this investigation thereby forcing one.

ORM's recommendation was to investigate fully the complaints coming from our offices located at 717 14th Street NW. [Please Note: When Risk Management sent the Department this Risk Alert, it inappropriately identified me as Support Staff member and not as AFGE Local 2978's representative for affected employees. This was done purposely and throughout this whole process I have not been identified as the individual who first raised this issue as it was raised on behalf of employees within the STD Control Program.]

The Agency was given until November 5, 2003 to respond to the Occupational Safety and Health Notice. On November 3rd, Mr. Buford, [Agency Director who *you* appointed] responded by letter [See Page    of ORM Sec] stating after checking with several individuals, Dr. Karyn Berry, Chief, Bureau of Communicable Disease Control and Julien Tolver, DOH Risk Representative. *The General consensus is there is a perceived and/or real threat of violence at the location. He stated that Ron Lewis, Sr. Deputy Director [a friend of yours], Chief Operating Officer to work with Dr. Berry and Mr. Tolver in assembling a management investigation team to assess the situation, take immediate appropriate actions and provide follow-up recommendations to resolve the issues contributing to the situation. They were given the whole month of November to provide a status report [by November 12th] and to submit a final report [two weeks later].*

➤ On November 17, employees at STD Control's Administrative Offices were told they were requested to speak with representatives from the Director's office about their positions and related concerns. These interviews were broken down into days.

*I was the only staff member to receive a written notice of my interview from my supervisor, Michelle Amar-Harried, a direct assignee from CDC. I was scheduled to meet in Dr. Phyllis Mayo, Chief of Staff's, office but met in Mr. Lewis' office with Mr. Tolver and a Ms. Martin [whom I've never met, did not know who she was or her vested interest into our concerns]. Dr. Mayo was not there for my interview.*

Staff members were asked about Dale Jackson, Motor Vehicle Driver who was the male staff member exhibiting threatening and ill rational behavior, along with questions about their working conditions. [Mr. Jackson's behavior has been a issue here as well as the sites he visits to pick up reports, like Howard University and Planned Parenthood even at our own Payroll Office, Ms. Brown/Ms. Ross.] Based on of the responses from staff members, Mr. Tolver decided that all employees from the STD Clinic should also be interviewed.

* Most employees from the Administrative Office told me that Dr. Mayo did not appear to really want to hear how they really felt. One employee told me, *she is not for us, she is political.* During the interviews that Dr. Mayo was part of employees said she tried to reword/change questions so that the answers would come out the way she wanted them to not the way they really were. She also told employees that she did not want to hear anything that was over a year old.

Maybe we don't understand the position of Chief of Staff. I would think that this individual would be a cordial, understandable, well-rounded and intelligent person. An individual who can speak with anyone no matter who they are, where they come from or their education background. Dr. Mayo does not exhibit these qualities and we wonder where she came from since we had no knowledge of her appointment, no introduction or notice of her joining our Agency.

* AFGE Local 2978's introduction to Dr. Mayo was a letter from her stating that our Union office was to be moved in two (2)

veeks to 2146 24th Place, NE. course this was a surprise and untimely. Not only was this timeframe short, but the location was in a building housing a treatment facility without one of our members working at this site. We then asked to meet with Dr. Mayo regarding the move.

*This was our introduction to the new Chief of Staff who can not hold a candle to Rosiland Keitt who along with Dr. Walks should have been receiving a monetary award for all she did to foster and nourish labor/management relations and how valued she made employees feel during her short tenure..*

During this forced meeting, we found out that two (2) months prior to our original notice, the Agency was looking to relocate our Union office.



District of Columbia Government
## Office of Risk Management
### Risk Control Division
# Occupational Safety and Health Notice

October 10, 2003

Dr. Karyn Berry, Assistant Deputy Director
Department of Health
825 North Capitol Street, NE
4th Floor, Suite 4400
Washington, DC 20002

**OSH Risk:  Potential Workplace Violence Exposure**
**Location: 717 14th Street, NW, 9th Floor**
**Date of Complaint Call: October 8, 2003**

Dear Dr. Berry

This is an Occupational Safety and Health Notice (OSHN-DOH-10-08-2003) to inform you of serious conditions related to fear of potential workplace violence at 717 14th Street, NW. Occupational Safety and Health Notices are issued when conditions require immediate attention by an Agency's Director and/or management staff.

**Background:**

This report is a follow-up to a call from a Department of Health employee to the Office of Risk Management, Risk Control Division, where OSHA complaints from the public sector are addressed. The complaint concerns fear of workplace violence, which is addressed by the Occupational Safety and Health Act of 1970, Section 5 (a)(1) , the General Duty Clause that states "every employer has the general duty to furnish each employee with employment and places of employment free from recognized hazards causing or likely to cause death or serious physical harm." (See also DC Code: 32.1103, (a) (1), 2001 Edition, Duties of employer and employees.) This report is also follow-up to a previous similar complaint received in August, which we understood as having been addressed by the Agency's management. Our office was informed following this recent call that the Agency was waiting for an investigation by the Office of Risk Management.

**Methodology:**

Our investigation and interviews at 717 14th Street, NW were in no way an attempt to find fault with any parties in this complaint. As with any response to an Occupational Safety and Health complaint, the purpose was to determine if a hazard (or perceived hazard) exists and direct management to resolve any issues found. As a result a meeting was only held with the complainants, during which they were given an "open table" format to express their feelings. Some questions were asked for further clarification, as necessary.

---

Dr. Karyn Berry, Assistant Deputy Director
October 10, 2003
Page 2

**Observations:**

During the meeting and interviews held with the four staff members of the Department of Health located at the worksite, we found the employees under considerable stress and fear of workplace violence. As such, it must be noted that one complaint of fear of workplace violence is sufficient to warrant an investigation on the part of management, whether that threat is perceived or has actually taken place verbally or physically.

**Recommendation:**

OSHN-DOH-10-08-2003      It is recommended that the Agency investigate fully the complaints coming from the office located at 717 14th Street, NW. Fear of potential violence at the facility is evident. The issue of potential workplace violence whether perceived or actual, has also elevated stress levels (a health issue in itself) and must be resolved.

**NOTE:** The booklet, *Dealing with Workplace Violence a Guide for Agency Planners*, available from the U.S. Office of Personnel Management may prove useful in working with this issue. It is available at http://www.opm.gov/ehs/workplac/index.asp#handbook. Due to the nature of this complaint, investigation and any necessary corrective action may need to include input from agency management, personnel/human resources, legal, employee relations, and possibly protective services. Counseling resources may also need to be obtained.

Please provide a response to this Occupational Safety and Health Notice by November 5, 2003. The response should include actions taken or planned and completion dates or estimated completion dates. You may also include any disagreement with the recommendations given in this document.

Should you have any questions in regards to this Notice, please feel free to call our office.

Sincerely,

John. J. Dougan, ARM, ALCM
Assistant Director

Cc:    James Buford, Director
       John Heath, Program Manager
       Ronald Lewis, Chief Operating Officer, Director's Office
       Sandra Marley, Risk Management Specialist
       JoAnn McCarthy, Support Staff
       Dr. Michael Richardson, Medical Director, Medical Affairs
       Julian Tolver, Agency Risk Management Representative

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF HEALTH

★ ★ ★



**Office of the Director**

November 3, 2003

John J. Dougan, ARM, ALCM
Assistant Director
D.C. Office of Risk Management
Risk Control Division
441 4th St. NW, Suite 800S
Washington, D.C. 20002

Dear Mr. Dougan:

This is in response to your October 10, 2003 letter to Dr. Karyn Berry regarding your findings and recommendations on the workplace situation on the 9th Floor of 717 14th St. NW. After reviewing your letter, I have obtained additional information from Dr. Berry, who manages the staff at the referenced location, and received some general recommendations from Julian Tolver, Department of Health (DOH) Risk Representative. The general consensus is there is a perceived and/or real threat of violence at the location. Whether perceived or real, this is not a situation the Department of Health will tolerate for its employees.

I am asking Mr. Ronald Lewis, DOH Chief Operating Officer, to work with Dr. Berry and Mr. Tolver to assemble a management investigation team to assess the situation, take immediate appropriate actions, and provide follow-up recommendations to resolve the issues contributing to the situation. I am requesting that the team start the week of November 3, 2003, provide a status report by November 12th, and submit a final report within the following two weeks.

Please feel free to contact Mr. Tolver at 202-997-5209 or Mr. Lewis at 202 442-5999.

Sincerely,

James A. Buford
Director

CC:   Ronald Lewis, DOH
      Phyllis Mayo, DOH
      Dr. Karyn Berry, MD, DOH
      John Health, DOH
      Julian Tolver, DOH
      Sandra Marley, DCORM

---

825 North Capitol Street, N.E. Washington, D.C. 20002 (202) 441-6937 FAX (202) 442-1788

Dr. Karyn Berry, Assistant Deputy Director
October 10, 2003
Page 2

**Observations:**

During the meeting and interviews held with the four staff members of the Department of Health located at the worksite, we found the employees under considerable stress and fear of workplace violence. As such, it must be noted that one complaint of fear of workplace violence is sufficient to warrant an investigation on the part of management, whether that threat is perceived or has actually taken place verbally or physically.

**Recommendation:**

OSHN-DOH-10-08-2003     It is recommended that the Agency investigate fully the complaints coming from the office located at 717 14th Street, NW. Fear of potential violence at the facility is evident. The issue of potential workplace violence whether perceived or actual, has also elevated stress levels (a health issue in itself) and must be resolved.

**NOTE:** The booklet, *Dealing with Workplace Violence a Guide for Agency Planners,* available from the U.S. Office of Personnel Management may prove useful in working with this issue. It is available at http://www.opm.gov/ehs/workplac/index.asp#handbook. Due to the nature of this complaint, investigation and any necessary corrective action may need to include input from agency management, personnel/human resources, legal, employee relations, and possibly protective services. Counseling resources may also need to be obtained.

Please provide a response to this Occupational Safety and Health Notice by November 5, 2003. The response should include actions taken or planned and completion dates or estimated completion dates. You may also include any disagreement with the recommendations given in this document.

Should you have any questions in regards to this Notice, please feel free to call our office.

Sincerely,

John. J. Dougan, ARM, ALCM
Assistant Director


Cc:     James Buford, Director
        John Heath, Program Manager
        Ronald Lewis, Chief Operating Officer, Director's Office
        Sandra Marley, Risk Management Specialist
        JoAnn McCarthy, Support Staff
        Dr. Michael Richardson, Medical Director, Medical Affairs
        Julian Tolver, Agency Risk Management Representative



GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF HEALTH

★ ★ ★

Office of the Director

November 3, 2003

John J. Dougan, ARM, ALCM
Assistant Director
D.C. Office of Risk Management
Risk Control Division
441 4th St. NW, Suite 800S
Washington, D.C. 20002

Dear Mr. Dougan:

This is in response to your October 10, 2003 letter to Dr. Karyn Berry regarding your findings and recommendations on the workplace situation on the 9th Floor of 717 14th St. NW. After reviewing your letter, I have obtained additional information from Dr. Berry, who manages the staff at the referenced location, and received some general recommendations from Julian Tolver, Department of Health (DOH) Risk Representative. The general consensus is there is a perceived and/or real threat of violence at the location. Whether perceived or real, this is not a situation the Department of Health will tolerate for its employees.

I am asking Mr. Ronald Lewis, DOH Chief Operating Officer, to work with Dr. Berry and Mr. Tolver to assemble a management investigation team to assess the situation, take immediate appropriate actions, and provide follow-up recommendations to resolve the issues contributing to the situation. I am requesting that the team start the week of November 3, 2003, provide a status report by November 12th, and submit a final report within the following two weeks.

Please feel free to contact Mr. Tolver at 202-997-5209 or Mr. Lewis at 202 442-5999.

Sincerely,

James A. Buford
Director

CC:    Ronald Lewis, DOH
       Phyllis Mayo, DOH
       Dr. Karyn Berry, MD, DOH
       John Health, DOH
       Julian Tolver, DOH
       Sandra Marley, DCORM

825 North Capitol Street, N.E. Washington, D.C. 20002 (202) 441-6937 FAX (202) 442-4788

language used by the staff person engaged in the phone conversation included phrases such as, "They don't know who they messing with" and "I know they are behind the letter sent to the IG". The staff person (Mr. J.) who was speaking on the cell phone did not speak directly to the staff person (Ms. E.) who claims to have been intimidated. The staff member (Ms. E.) who claims to have been intimidated speculated that the incident she witnessed was in response to an anonymous letter, which had been sent to the D.C. Office of the Inspector General on October 3, 2003 alleging threatening behavior and professional misconduct against the other staff person (Mr. J.).

b) The staff member (Mr. J.) alleged to have demonstrated the above referenced intimidating behavior shared during his interview with MIT that he believes that the staff member (Ms. E.) making the above allegations sent an anonymous letter to the D.C. Office of the Inspector General making claims against him. The letter contained a great deal of erroneous information that seemed to be based on negative feelings on the part of the author.

c) Staff members (Ms. U. and Ms. B.) who were hired in this office since October, 2001 and do not have first-hand information about a verbally provocative incident which occurred two years ago time, indicate that they have been told by some of their co-workers to stay away from another staff member (Mr. J.) because "he was dangerous and had threatened another staff member in the past." Although this represents hearsay, it continues to contribute to an unhealthy work environment, fosters possible misinterpretation of behavior, and perpetuates feelings of unrest and possible intimidation.

d) Interviews revealed that arguments and hostility occur between staff too frequently at the STD administrative office. Many staff believe that this contributes to unhealthy working conditions, low morale and, frequent absenteeism among non-supervisory personnel.

e) During interviews with supervisory personnel, several of them stated concerns about Union Local #2978- 4th District office located on the 9th floor of the STD administrative office. They further stated that their concerns are related to (1) the Union President's interference with supervision of non-supervisory personnel, and (2) repeated altercations, some often hostile, between supervisors and the Union President. Written documentation has been received by MIT from several supervisors regarding this matter (See attachment C).



• "Us against them" attitude (District employees vs. Federal employees) prevents sense of cohesiveness, rather perpetuates splintered functioning, tense and sometimes hostile work environment.

Evidence Include:
a) Concern was verbalized about perceived discrepancies, which exist between the Federal and District employees assigned to this office. District employees feel that there are more opportunities for professional advancement for the Federal employees; they expressed concern that the grades are higher for the Federal staff and many resent being supervised by Federal employees. This "us against them" attitude seems to be quite

October 3, 2003

Mr. Charles Maddox, Esq.
Office of the Inspector General
District of Columbia Government
717 14th Street NW
Washington, DC  20005

Dear Mr. Maddox:

Because of the manner in which the majority of the workforce is treated within the District of Columbia Government, particularly within the Department of Health, I am reporting behavior that I feel constitutes fraud and waste.    These actions took place within the Preventative Services Administration, Bureau of Sexually Transmitted Disease Control Program [717 14th Street, NW~Suites 750 & 950] under the supervision of John T. Heath, Program Manager, GS 14/10, Federal Direct Assignee from CDC.

Dale Jackson's, [Motor Vehicle Driver, DS 6] principle duty is to pick-up and deliver lab reports from various medical facilities. He also is to deliver or pick-up mail. He has the use of a District vehicle for the whole day. While he was supposed to be working, he was attending mortuary school and since has received his license. How is it possible for an employee to attend school and get paid to perform the work he was hired to do?  If his schooling was related to his job or if it was approved through official channels, that's one thing. *But if he was allowed to go to school and still was getting paid as though he was performing the duties he was hired for, to me, that constitutes fraud.*   He now has two (2) jobs within one eight hour period. His MVO job and his mortuary job. Can we all do the same?  If we can, please let me know. We would all like an opportunity to attend school to enhance our livelihoods. But we have not been given the same opportunity as Mr. Jackson. He has even been afforded a promotion when others did not.

• Even though Mr. Jackson has a government issued cell phone and pager, he cannot be called by anyone but Mr. Heath.] Dr. Karyn Berry, Division Chief for the Division of Communicable Diseases cannot call Mr. Jackson but she is aware of his behavior. She cannot get him to do anything herself. The administrative officer, Mrs. Evans cannot call Mr. Jackson. She does not have his number.

On occasion, paperwork needs to be picked-up and delivered. Only Mr. Heath can make the request to Mr. Jackson. Mr. Jackson would get angry, state not to call him and that he would not do as requested. Mr. Jackson demonstrated violent behavior towards a female employee, LaJuan Lockerman and was put on administrative leave for two (2) weeks. Mr. Jackson came back into the office approximately around 11:00 am just to threaten Mrs. Lockerman.  [Other employees have been suspended for lesser, chumped-up charges.]

Because of Mr. Jackson's behavior, his workplace was moved from the 7th floor to the 9th floor. Not because of his violent behavior towards Mrs. Lockerman, but because federal direct assignees were stating they would refuse to come to work if he was not removed. I guess this was to alleviate the problem but instead, all it did was have the female employees on the 9th floor fearful of his behavior. His keys to the offices were supposed to have been confiscated, per Mr. Heath, but they were not. He still has access to the offices. Employees' sense of security is gone on both floors. Yet Mr. Jackson receives positive evaluations.

My whole problem with this situation is that the Agency is aware of all this. Dr. Marlene Kelly was aware of it many years ago. I do not understand this. Our investigators do not have cell phones that are at their disposal 24-7 [Mr. Jackson does]. They go out into the field where they might have to enter places that are unsafe to communicate with contacts. I don't even know if they have cell phones. I was told they had to check them out at the beginning of the day and check them back in at the end. I don't understand this. If any employee needs a cell phone, it is an investigator who has to go into areas of the city that others don't. Who have to communicate with people with specific behaviors. **But yet Mr. Jackson has a cell phone basically for calls from only one person officially and that is Mr. Heath. To me that constitutes waste. So the way it looks, our investigators safety and well being is not a priority. I question:**

1). **Why is Mr. Jackson given special privileges by Mr. Heath, Program Manager and Dr. Karyn Berry, Division Chief?**

2). **Why did Mr. Heath and Dr. Berry defend Mr. Jackson when approached by the Office of Risk Management investigating his violent behavior preventing any further investigation.**

3). **How is it that Mr. Jackson was hired for eight (8) hours of work, gets paid for eight (8) hours, but can also maintain another job at the same time for a private concern?**

4). **Since the STD Program does not have its own budget and its major funding is through grants, how can the Agency allow this to happen?**

*This document was written on the behalf of the District Government Employees within the STD Program who have not been promoted, are performing duties of higher graded positions, whose ceiling on advancement is a DS9, and who are not considered for supervisory positions. Supervisory positions are mostly performed by federal direct assignees. This leaves no slots for employees who work for the District of Columbia Government and are under the authority of the District of Columbia Government, while the federal direct assignees are not. Direct assignees are paid, submit leave slips [very rarely], disciplined and receive benefits under the authority of the Federal Government and are not under the jurisdiction of the District of Columbia Government. Mr. Buford cannot hire, fire or discipline federal direct assignees.*

*Sincerely,*

*Because of Mr. Jackson's behavior and the fact that he once made a statement that if anyone made him loose his job, he would kill them, I am not submitting this document with my identifying information. If you actually perform an investigation, you will find information herein factual and you should end up speaking to me through your investigation.*

Cc:  L. Cropp, S. Allen, V. Orange, J. Buford [sent to Mr. Buford only because he is the director of DOH and responsible for the action of DOH's management officials ~ he is non-responsive to workforce issues and has made little or no attempts to resolve them.]

pervasiv and was expressed by all of the Distr employees in this office. It appears to be a ve ensitive topic and evokes a great deal of negative emotion when discussed. There is also the feeling that the District employees should not be supervised by the Federal employees.

- **Poor communication and misinterpretation of the behavior of co-workers. There seems to also be evidence of possible projection of one's feelings onto other persons.**

Evidence include:

a) As has been previously stated there was a negative verbal interchange between two staff persons (Ms. L. and Mr. J.) of the STD program two years ago. One person (Ms. L.) is no longer with the agency of their own choosing and the other person (Mr. J.) continues to work at DOH within the STD program. The incident was dealt with and one of the persons (Mr. J.) involved was disciplined. As a result of that situation he (Mr. J.) has assumed an aloof, no-nonsense approach to dealing with his co-workers. He interacts only with those with whom it is necessary to satisfactorily complete the responsibilities of his job. Otherwise, he does not speak to his co-workers, does not answer calls from them or engage in any conversation. He feels this is the best approach to avoid any misunderstanding or conflict. It appears that this behavior is being interpreted as hostile and intimidating. The employee (Mr. J.) in question is described by the Program Manager as a good employee who handles the responsibilities of his job effectively, and he is dependable and polite. Several managers and non-supervisory personnel continue to interpret this behavior as intimidating and hostile. However, it was noted by a senior level staff person, (Mr. S.) that many of the persons who are accusing the aforementioned individual of not speaking also engage in the same non-speaking behavior when addressed by others. There seems to be some negative feelings from a previous incident, which resurface with little, if any provocation.

*stop*

\* **IV. RECOMMENDATIONS**

*Immediate Actions:*

- A DOH District government employee should supervise the Clerical Assistant/Typing staff and work closely with the Federal assignees supervisors. Presently all supervisory personnel of the program are federal assignees. Discipline of District employees (non-supervisory) has often been difficult because the Federal supervisors are prohibited from disciplining District government employees according to the District Personnel Manual (DPM). Recommendations for disciplinary action are referred to the Chief, Bureau of Communicable Disease Control for consideration and action.

- The Supervisory Medical Officer should have direct supervision of all personnel at the STD clinic, specifically the Disease Investigators who provide a clinical/disease surveillance function and are located at the STD clinic.

- Roles and responsibilities of all staff in the STD program need written clarification, and staff need to familiarize themselves with the responsibilities described in their position descriptions.

- DPM policies that relate to employee conduct should be distributed and explained to all employees by management. Employees should acknowledge the receipt and understanding of the policies through signature. These polices must also be enforced by DOH management.

- Both management and staff should receive training in the following:

    a) DPM policies and regulations regarding employee conduct
    b) Anger/Stress Management
    c) Conflict Resolution
    d) Effective Communication
    e) Professional Workplace Behavior
    f) Teamwork

STD management should identify resources and/or providers for the recommended training.

*Action that must occur within thirty (30) days:*

The Office of the Director will conduct a comprehensive assessment of the STD program to identify and address issues related to the following:

    a) Management and Staff relations
    b) Management Accountability
    c) Performance Standards
    d) Time and Attendance Policy
    e) Staff Position - Responsibilities and Compensation
    f) Physical layout, ergonomics and space allocation
    g) Inventory Control

Explore options for career development for clerical staff

## V. CONCLUSION

Based on interviews with all STD managerial and administrative personnel located at 717 14th Street, 7th and 9th floors, the MIT has determined that <u>evidence does suggest there are perceived hazards and some staff claim to believe that the potential for workplace violence exposure(s) exists.</u> Five out of 14 staff claims to believe the potential exists. It is important to note that these claims are based on an incident that occurred in October 2001 and behaviors that were adopted subsequent to that situation, as well as on apparently contentious interactions that reportedly occur frequently.

Please feel free to contact me at (202) 442-5999 if you have any questions.

Sincerely,

James A. Buford
Director