


# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Performance Evaluation System
## Report of Performance Rating

D.C. Office of Personnel

| 1. EMPLOYEE'S NAME: | Last | | First | | Middle Initial |
|---|---|---|---|---|---|
| | | JACKSON | DALE | | S |

| 2. TITLE | 3. GRADE / STEP | 4. RATING PERIOD |
|---|---|---|
| Motor Vehicle Operator | RW 6/6 | April 1, 2004 – March 31, 2005 |

| 5. AGENCY NAME (SORTED BY AGENCY CODE) | 6. DATE COMPLETED |
|---|---|
| Department of Health (HC) | May 1 3, 2005 |

| 7. TYPE OF REPORT | 8. DATES SUPERVISED | 9. TYPE OF POSITION |
|---|---|---|
| Scheduled/Official Rating | From: April 1, 2004 To: March 31, 2005 | Full-Time |

**RECEIVED**

## INFORMATION

1. Underline the sub-factors that are pertinent to the position.
2. Rate the sub-factors that are pertinent to the position according to the following:
   a. A plus sign (+) indicates that the employee is strong in a sub-factor.
   b. A check sign (√) indicates that the employee's performance is acceptable in a sub-factor.
   c. A minus sign (-) indicates that the employee needs improvement in a sub-factor.
3. Determine the ratings for each major factor, as well as their overall performance rating.
4. On the attached page, provide written justification explaining the employee's performance.

DEC 1 8 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## FACTORS FOR RATING

| 1. | QUANTITY: Satisfactory |
|---|---|
| √ | Amount of Work |
| + | Completion of Work on Schedule |
| 2. | QUALITY: Excellent |
| + | Accuracy |
| + | Neatness of Work Product |
| √ | Thoroughness |
| √ | Judgment |
| + | Oral Expression |
| √ | Written Expression |
| 3. | WORK HABITS: Satisfactory |
| √ | Observance of Work Hours |
| + | Attendance |
| + | Observance of Rules Including Safety |
| √ | Economy of Times and Materials |
| √ | Compliance With Work Instructions |
| + | Orderliness of Work |
| √ | Job Interest |
| √ | Initiative |
| √ | Resourcefulness |
| 4. | PERSONAL RELATIONS: Excellent |
| √ | Cooperation with Co-workers (Internal Customer Service) |
| + | Dealing with the Public (External Customer Service) |
| + | Personal Habits |

| 5. | ADAPTABILITY: Excellent |
|---|---|
| + | Performance in New Situations |
| + | Performance in Emergencies |
| 6. | SUPERVISION AND PLANNING: |
| | Effectiveness In: |
| — | Planning Broad Programs |
| — | Adapting Work Program to Broader or Related Programs |
| — | Devising Procedures |
| — | Laying Out Work Establishing Standard of Performance for Subordinates |
| — | Directing Reviewing and Checking Work of Subordinates |
| — | Instructing Training and Developing Subordinates in work |
| — | Promoting High Morale |
| — | Delegating Clearly Defined Authority to Act |
| — | Decision-Making Process |
| — | Determination and Utilization of Manpower and Materials |
| — | Efforts to ensure EEO in all appropriate aspects of Recruitment, Hiring, Training, Promoting, Recognition, etc. |
| 7. | PERFORMANCE STANDARDS/OTHER (Specify): |

## TEMPORARY ASSIGNMENTS OUT OF JOB CLASSIFICATION

| | | | | |
|---|---|---|---|---|
| - | | | | |
| - | | | | |

## OVERALL PERFORMANCE RATING ASSIGNED

☐ Outstanding    ☒ Excellent    ☐ Satisfactory    ☐ Unsatisfactory

| Supervisor's / Rater's Name & Signature | Date 6/14/05 | Employee's Name & Signature | Date 06-15-05 |
|---|---|---|---|
| *This rating is based on my personal knowledge and observation of the employee's performance. (REQUIRED FOR ALL RATINGS) | | * This rating has been discussed with me. (REQUIRED FOR ALL OFFICIAL RATINGS) | |

| Reviewer's Name & Signature | Date | Agency Director's Name & Signature | Date |
|---|---|---|---|
| * This rating has been reviewed and receives my approval. (REQUIRED FOR ALL OFFICIAL RATINGS) | | * This rating has received a second-level review and receives my approval. (REQUIRED FOR ALL OUTSTANDING AND UNSATISFACTORY RATINGS ONLY) | |

1



# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Performance Evaluation System
## Report of Performance Rating

D.C. Office of Personnel

| 1. EMPLOYEE'S NAME: Last JACKSON | | First DALE | Middle Initial L |
|---|---|---|---|
| 2. TITLE Motor Vehicle Operator | 3. GRADE / STEP RW  6 / 6 | 4. RATING PERIOD April 1, 2003 - March 31, 2004 | |
| 5. AGENCY NAME (SORTED BY AGENCY CODE) Department of Health (HC) | | 6. DATE COMPLETED April 1 9, 2004 | |
| 7. TYPE OF REPORT Scheduled/Official Rating | 8. DATES SUPERVISED From: April  1, 2003 To: March 31, 2004 | 9. TYPE OF POSITION Full-Time | |

## INFORMATION

1. Underline the sub-factors that are pertinent to the position.
2. Rate the sub-factors that are pertinent to the position according to the following:
   a. A plus sign (+) indicates that the employee is strong in a sub-factor.
   b. A check sign (√) indicates that the employee's performance is acceptable in a sub-factor.
   c. A minus sign (-) indicates that the employee needs improvement in a sub-factor.
3. Determine the ratings for each major factor, as well as their overall performance rating.
4. On the attached page, provide written justification explaining the employee's performance.

## FACTORS FOR RATING

| | | | | |
|---|---|---|---|---|
| **1.** | **QUANTITY:** Outstanding | | **5.** | **ADAPTABILITY:** Outstanding |
| + | Amount of Work | | + | Performance in New Situations |
| + | Completion of Work on Schedule | | + | Performance in Emergencies |
| **2.** | **QUALITY:** Outstanding | | **6.** | **SUPERVISION AND PLANNING:** _____ |
| + | Accuracy | | | *Effectiveness In:* |
| + | Neatness of Work Product | | — | Planning Broad Programs |
| + | Thoroughness | | — | Adapting Work Program to Broader or Related Programs |
| + | Judgment | | — | Devising Procedures |
| + | Oral Expression | | — | Laying Out Work Establishing Standard of Performance for Subordinates |
| + | Written Expression | | — | Directing Reviewing and Checking Work of Subordinates |
| **3.** | **WORK HABITS:** Outstanding | | — | Instructing Training and Developing Subordinates in work |
| + | Observance of Work Hours | | — | Promoting High Morale |
| + | Attendance | | — | Delegating Clearly Defined Authority to Act |
| + | Observance of Rules Including Safety | | — | Decision-Making Process |
| + | Economy of Times and Materials | | — | Determination and Utilization of Manpower and Materials |
| + | Compliance With Work Instructions | | — | Efforts to ensure EEO in all appropriate aspects of Recruitment, Hiring, Training, Promoting, Recognition, etc. |
| + | Orderliness of Work | | **7.** | **PERFORMANCE STANDARDS/OTHER** *(Specify):* _____ |
| + | Job Interest | | — | |
| + | Initiative | | — | |
| + | Resourcefulness | | — | |
| **4.** | **PERSONAL RELATIONS:** Outstanding | | — | |
| + | Cooperation with Co-workers *(Internal Customer Service)* | | — | |
| + | Dealing with the Public *(External Customer Service)* | | | |
| + | Personal Habits | | | |

## TEMPORARY ASSIGNMENTS OUT OF JOB CLASSIFICATION

| | | | |
|---|---|---|---|
| - | | | |
| - | | | |
| - | | | |

## OVERALL PERFORMANCE RATING ASSIGNED

☒ Outstanding          ☐ Excellent          ☐ Satisfactory          ☑ Unsatisfactory

| Supervisor's / Rater's Name & Signature     Date 4/9/04 | Employee's Name & Signature     Date 02-09-04 |
|---|---|
| *This rating is based on my personal knowledge and observation of the employee's performance. (REQUIRED FOR ALL RATINGS) | * This rating has been discussed with me. (REQUIRED FOR ALL OFFICIAL RATINGS) |
| Reviewer's Name & Signature     Date | Agency Director's Name & Signature     Date |
| * This rating has been reviewed and receives my approval. (REQUIRED FOR ALL OFFICIAL RATINGS) | * This rating has received a second-level review and receives my approval. (REQUIRED FOR ALL OUTSTANDING AND UNSATISFACTORY RATINGS ONLY) |

1



# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Performance Evaluation System
## Report of Performance Rating




D.C. Office of Personnel

### WRITTEN JUSTIFICATION FOR THE OVERALL PERFORMANCE RATING

In the box below, please justify the employee's overall performance rating with a written explanation that provides a detailed description of the employee's performance between April 1 of last year and March 31 of this year. If the rating is "Unsatisfactory" you **must** also attach a copy of the *Letter of Warning*.

Mr. Jackson is self-motivated and frequently exceeds performance and expected commitments. He can be counted on to complete assignments despite time constraints. Mr. Jackson is extremely detail oriented when focused on work related activities, which allows him to excel at performing tasks accurately. Mr. Jackson takes the initiative to communicate with collaborators for scheduling pick up of specimens and delivery of supplies for convenience and efficiency. He consistently offers new suggestions and creative ways to improve courier service to sites and revises plans when necessary to meet last minute program deadlines and deliveries.

Mr. Jackson is articulate and verbally expresses ideas effectivelyand professionally. Mr. Jackson consistently observes 8-hour work day and when necessary overrides schedule to support last minute emergency reports to administrators or delivery of supplies to clinics. Maintains an excellent record of attendance and punctuality and plans absences in advance with immediate supervisor. Always follows rules and regulations of position, agency and the District and applies rules to all situations.

Finds ways to conserve and use limited resources and lets others understand the value of conservation of resources. Maximizes efficiency of scheduled route through excellent time management and has a strong understanding of how his job fits in with the overall STD Program operation. Always complies with instructions and utilizes professional knowledge to effectively perform duties associated with clinics, D.C. Public Health Lab, D.C. Government garage and DOH Administrators.

Consistently maintains an orderly automobile and professional work habits, tools, and information. Demonstrates organizational skills that enhance the potential of profitable work actions by letting others know who to contact or where to go when cars break down or in need of repair and inspections. Directs others in the concept of work and organizations as a benefit to performance by letting others know where to get licenses or directions to the nearest government gasoline station. Consistently takes initiative in implementing ideas, systems or policies that affect a work the delivery of supplies for the STD Program.

Manages own time efficiently, encourages feedback, and invests in self-development. Always displays positive attitude toward work and counsels those who are negative. Proactively works to remedy problems with his assigned automobile during flat tires and breakdowns. Consistently produces mare than the job requires by picking up supplies from the D.C. DOH warehouse and delivery to sites not normally scheduled for courier service by the STD Program.

Exhibits initiative for professional growth and seeks opportunity to contribute to the achievement of District goals. Learns new job skills quickly and is able to teach others. Excels at working with external customers to assess needs, resolve problems, and significantly exceeds customer expectations. Always acts in a way that supports all goals and efforts of the STD Control Program.

Extremely responsive and adaptive to change and new information and/or eventsby accepting new sites to route and relates new site hours to supervisor. Extremely effective at dealing with and making sense of uncertain situations such as traffic jams, road construction and scehduled road closures due to special events. Serves as leader in emergency situations and remains calm during inclement weather and accidents.

**G**   **ERNMENT OF THE DISTRICT OF COLUMBIA**
**Office of Human Rights**



Judiciary Square Office
441 4ᵗʰ Street, NW Suite 570N
Washington, DC 20001
Phone: (202) 727-4559 • Fax:(202) 727-9589

**Kenneth L. Saunders**
**Director**

Penn Branch Office
3220 Pennsylvania Avenue, SE, 1st Fl.
Washington, DC 20020
Phone: (202) 727-4559 • Fax:(202) 645-6390

## LETTER OF DETERMINATION

November 29, 2005

Dale Jackson
2926 Strauss Terrace
Silver Spring, M.D. 20902

**Reference:**   ***Dale Jackson v. D.C.  Department of Health***
**Docket No.: 04-370-DC (CN)**
**EEOC No.: 10CA400314**

Dear Mr. Jackson,

The Office of Human Rights (hereinafter "the OHR") has completed the investigation of the above-referenced complaint.  You are referred to as "**COMPLAINANT**."  The D.C. Department of Health is referred to as "**RESPONDENT**."  Complainant presented the following issues, which the OHR investigated.

## ISSUE(S) PRESENTED

I.   Whether Respondent discriminated against Complainant on the bases of his race (Black) and sex (male) when Respondent detailed Complainant on May 3, 2004 for sixty (60) days after an investigation and failed to detail any other employees.

II.   Whether Respondent retaliated against Complainant because he complained during an internal investigation that he was being discriminated against when Respondent extended his detail for another sixty (60) days.

## JURISDICTION

Respondent is a District of Columbia government agency.  Respondent maintains a presence at 717 - 14ᵗʰ Street, N.W., Washington, DC.   Respondent is not exempt for any known reason from the laws of D.C. that prohibit unlawful discrimination.  Respondent is therefore subject to the enforcement jurisdiction of the OHR.

*Dale Jackson v. DC Dep____ ____ent of Health*
Docket No.: 04-370-DC (CN)
EEOC No.: 10CA400314
Page 3 of 11

In addition, the OHR's record shows that two other employees (Black, female) were permanently reassigned to new worksites as a result of the investigation. Respondent contends that it made the decision in order to diffuse the situation at the STD unit.

According to Complainant's response to a request for additional information, Complainant states that he was aware that two female (Clerical Assistant and Administrative Officer) employees were detailed to new worksites.

The OHR's record reveals that interviews conducted by the OHR investigator with the Clerical Assistant and the Administrative Officer indicate that both employees were permanently transferred to new worksites as a result of the investigation. According to the female employees, neither of them requested the transfer.

Information in the OHR record obtained from interviews with the employees indicates that Complainant was a violent individual. In addition, the employees indicated that they filed the Occupational Safety and Health Notice because they were afraid of Complainant's behavior. Both employees indicated during the interviews that they felt as if they were being discriminated against and not Complainant since Complainant was only detailed and not transferred.



The OHR's record shows that another interview conducted by the OHR investigator with the Project Manager (Black, male) reveals that the internal investigation was not prompted by a specific incident, but by various complaints made by different employees (Black, females). According to the Project Manager, the employees stated that they felt threatened by Complainant's presence and attitude, but could not cite any specific incident. The result of the investigation was based on the perceptions of staff employees.

In addition, the Project Manager stated during the interview that two Black, females were permanently transferred to new worksites as a result of the internal investigation, which was conducted by the Office of Risk Management. According to the Project Manager, Complainant's detail was for sixty (60) days.

According to the Chief Operating Officer,[2] two employees (Black, female) and Complainant were detailed in order to diffuse the perceived hostile environment at the STD unit. In addition, the Chief Operating Officer stated that the decision was made by a panel which consisted of the Office of Risk Management, the Legal Counsel, and Respondent. Finally, the Chief Operating Officer stated that Respondent did not consider Complainant's detail to be an adverse action because it did not affect Complainant's grade, step, salary or seniority.

An interview conducted by the OHR's investigator with the Chief of the Bureau of Communicable Diseases (Black, Female) revealed that Complainant was detailed for a sixty (60) day period. According to the Chief of the Bureau of Communicable Disease

---

[2] Interview conducted by an OHR's investigator.

*Dale Jackson v. DC Department of Health*
Docket No.: 04-370-DC (CN)
EEOC No.: 10CA400314
Page 5 of 11

an additional period. The Project Manager also stated that he did not take part in the decision-making process of Complainant's detail extension.

The Chief of the Bureau of Communicable Disease Control indicated that she had no information as to why Complainant's detail was extended and stated that she had no involvement in the decision-making process.

According to the Project Manager and the Chief of the Bureau of Communicable Disease Control, Complainant did not express, or otherwise indicate, to them that he felt discriminated against or targeted during the investigation process or after the investigation was completed. However, the Chief of the Bureau of Communicable Disease Control disclosed that Complainant had stated that he felt targeted by the two Black, female employees.

The OHR's record also shows that interviews conducted by the OHR investigator with the Clerical Assistant (female, Black) and Administrative Officer (female, Black) indicated that Complainant did not file a discrimination complaint. In addition, the Clerical Assistant stated that as Representative of the Union, Complainant never approached her to express his concerns of discrimination during or after the investigation by Respondent. Furthermore, both employees stated that they did not know whether Complainant's detail was extended.

## STANDARD OF REVIEW

In this forum, in order for Complainant to prevail, the OHR record must contain credible, probative and substantial evidence from which a reasonable person would conclude that Complainant met the *prima facie* elements of discriminatory or retaliatory behavior, and that a legitimate, nondiscriminatory or non-retaliatory explanation for the behavior does not exist. 4 DCMR § 715.1; 4 DCMR § 499.1.

## LEGAL ANALYSIS

## DISCRIMINATION

The DCHRA makes it unlawful to "...discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age, race, color, religion, sex or national origin," among other protected categories. D.C. Official Code § 2-1402.11(a)(1) (2001 Edition).

In a case brought under the DCHRA, the same three-part test applicable to Title VII cases applies. *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d 1095, 1099 (D.C. 1986). The initial burden is on the employee to prove his *prima facie* case of discrimination. *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 (D.C. 1993); *see Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). If the employee satisfies his burden, he raises a rebuttable presumption that the employer's

*Dale Jackson v. DC Department of Health*
Docket No.: 04-370-DC (CN)
EEOC No.: 10CA400314
Page 7 of 11

An adverse action is one which affects the terms, conditions, or privileges of employment or future employment opportunities, i.e., hiring, firing, failing to promote, reassignment with significantly different responsibilities, a significant change in benefits, such that a reasonable trier of fact could conclude that the employee suffered objectively tangible harm. *Burlington Industries Inc. v. Ellerth*, 524 U.S. 742, 761; *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999). Minor changes in work related duties, unless accompanied by some other adverse change in the terms, conditions or privileges of employment, is not sufficient to establish an adverse action. False accusations, public humiliation, or loss of reputation constitute an adverse action only if they result in adverse changes in the terms, conditions or privileges of employment. Formal criticism or reprimands, without additional disciplinary action such as change in grade, salary or other benefits, are not adverse employment actions. Adverse personnel actions must have some negative consequences with respect to the employee's employment. *Stewart v. Evans*, 275 F.3d 1126, 1135-1136 (D.C. 2002). Everything that makes an employee unhappy is not actionable. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).

Factors to establish that membership in the protected class was a substantial factor in the employer's decision to take the adverse action include whether (1) Plaintiff was replaced with a person outside her class or (2) "similarly situated" persons outside the Plaintiff's protected class were treated more favorably. *See Hollins v. Federal National Mortgage Association*, 760 A.2d 563, 578 (2000). A "similarly situated" person is one who is similar to the Plaintiff in all relevant aspects. *Id.* Relevant aspects include their respective employment situation and the circumstances generating the allegation of discrimination. *Id.* In short, in order to be "similarly situated," Plaintiff and the other employee must have a comparable employment status, and must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's response to it. *Hollins* at 578; *Rap, Inc. v. DCCHR*, 485 A.2d 1973 (1984). The precise elements in a *prima facie* case will be determined by the nature of the alleged discrimination. *McDonnell Douglas*, 411 U.S. at 802 n.13.

### Respondent Did Not Discriminate Against Complainant On The Bases Of Race (Black) And Sex (Male) When Complainant Was The Only Employee Detailed By Respondent As A Result Of An Investigation

Complainant proffers insufficient evidence to satisfy a *prima facie* case for discrimination. Complainant successfully satisfies the first and second elements of his case. First, Complainant is a member of the protected classes by virtue of the fact that he is Black and male. Second, the OHR's record contains evidence that Complainant was qualified for his position as Courier; performance evaluations in his personnel file were rated as "outstanding" and "excellent." However, Complainant fails to satisfy the third element of his case. Respondent did not subject Complainant to an adverse action when it detailed him on May 3, 2004.

An adverse action is one which affects the terms, conditions, or privileges of employment or future employment opportunities, i.e., hiring, firing, failing to promote, reassignment

*Dale Jackson v. DC Dep____ ment of Health*
Docket No.: 04-370-DC (CN)
EEOC No.: 10CA400314
Page 9 of 11

If an employee successfully establishes a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate reason for taking the adverse action. If the employer does so, the burden shifts back to the employee to prove that the articulated reason is pretext for retaliation. *Burdine*, 450 U.S. at 256. In order for Complainant to prevail on his claim of retaliation in this forum, the OHR's record must contain credible, probative, and substantial evidence from which a reasonable trier of fact would conclude that the *prima facie* elements of a case of retaliation are present and that no legitimate, non-discriminatory explanation for the action exists.

### Respondent Did Not Retaliate Against Complainant Because He Complained During An Internal Investigation That He Was Being Discriminated Against When Respondent Extended His Detail For An Additional Sixty (60) Days.

Complainant fails to meet the elements of a *prima facie* case for retaliation. Complainant cannot satisfy the first element requiring that he have participated in a protected activity. The OHR's record shows no evidence that Complainant filed a discrimination complaint with Respondent's EEO Officer or that he, otherwise, participated in a protected activity.

Information in the OHR's record indicates that Complainant asserted in his rebuttal that he did not file a complaint of discrimination because he did not believe that Respondent's EEO Officer would be neutral and fair. Information obtained from interviews with management officials and a Union representative indicated that Complainant never complained to them about being discriminated against by Respondent. In failing to satisfy the elements of a *prima facie* case, Complainant's claim of retaliation fails.

Assuming, *arguendo*, that Complainant is able to satisfy the first element, his case for retaliation would still fail. In satisfying the first element, he would also satisfy the third element because he would be able to show a temporal relationship between the protected activity and his detail. However, Complainant would fail to establish a *prima facie* case because he cannot show that he satisfies the second element requiring that he suffer an adverse action.

As stated above, an adverse action is one which affects the terms, conditions, or privileges of employment or future employment opportunities, i.e., hiring, firing, failing to promote, reassignment with significantly different responsibilities, a significant change in benefits, such that a reasonable trier of fact could conclude that the employee suffered objectively tangible harm. Minor changes in work related duties, unless accompanied by some other adverse change in the terms, conditions or privileges of employment, is not sufficient to establish an adverse action. The OHR record contains information that Complainant's detail had no effect on his job duties, his salary, grade, step, or on his benefits. Thus, Complainant cannot show that he suffered an adverse action.

*Dale Jackson v. DC Depu...ment of Health*
Docket No.: 04-370-DC (CN)
EEOC No.: 10CA400314
Page 11 of 11

## RIGHT TO SUBSTANTIAL WEIGHT REVIEW

As a Complainant, you have the right to a "Substantial Weight Review" from the U.S. Equal Employment Opportunity Commission (EEOC). To obtain a Substantial Weight Review, you must, within fifteen (15) calendar days, send your written request to: State and Local Coordinator, EEOC, 1801 L Street, N.W., Suite 100, Washington, D.C. 20507-1002.

Sincerely,

Kenneth L. Saunders
Director

cc: District of Columbia Department of Health
   Ms. Bernardine Booker Brown, EEO Officer
   825 North Capitol Street, N.E., Suite 4176
   Washington, DC 20002



**American Federation of Government Employees**
**Local 2978 – District 14**
**District of Columbia Government**
**Department of Health**



January 15, 2004

717 14th Street NW
Suite 950~Box 14
Washington, DC 20005
Phone 202.727.9854/65
Fax 202.727.4934
Email anicejo@hotmail.com

JoAnn McCarthy
*President*

Mary A. Brawner
*Advisor to the President*

Deidre Sparrow
*Vice President*

Deontrinese Henderson
*Chief Shop Steward*

Ida Shade
*Treasurer*

Jennifer M. Johnson
*Secretary*

Andrea Champ
*Sergeant of Arms*

Yvonne Jackson
*Fair Practice Coordinator*

Andrea Champ
*Women's Coordinator*

**Delegates**
Deidre Sparrow
Yvonne Jackson
Jennifer Johnson
Deontrinese Henderson

**Administrations Represented**

Environmental Health
Public Health Laboratory
Lead Poisoning Prevention

Maternal & Child Health

Nutrition Programs (CSFP) & (WIC)

Preventive Health Services
Chronic Disease
Communicable Disease
Epidemiology & Health Risk Assessment

James F. Buford, Director
Office of the Director
Department of Health
District of Columbia Government
825 North Capitol Street NE
Washington, DC 20002

Dear Mr. Buford:

For some time now, we have brought to you matters that were affecting our membership in a negative way. We have made many attempts to amenably resolve pending issues to no avail. It seems as though frontline employee concerns are not taken seriously. There is a definite resistant to labor/management cooperation which I cannot understand because cooperative relationships foster better production, better services and accomplishes goals/objectives.

The Occupational Safety and Health Notice (OSHN-DOH-10-08-2003) informing you of serious conditions related to fear of potential workplace violence at 717 14th Street, NW was issued on October 10, 2003. You responded almost a month later on November 3, 2003 regarding an issue that you were already aware of and should have been trying to circumvent. Instead, you assigned the Chief of Staff, Phyllis Mayo as the lead team member for the investigative team that should have been under the guidance of the Office of Risk Management.

Not only is Dr. Mayo out of touch with employees, most employees don't even know who she is because she was not introduced to them. Dr. Mayo's obvious attitude towards employees was very apparent by the comments we received from our members, like, *Dr. Mayo is not for us, she's political, and she only wants to protect management.*

*Dr. Mayo's report was bias and inaccurate plus she included as attachments documents about me, the Union President that were irrelevant to the subject matter and detrimental to me regarding my character and my ability to represent or protect employees in our Unit.* In your letter responding to OSHA's Alert, you stated that *the general consensus is that there is a perceived and/or real threat of violence at the location. Whether perceived or real, this is not a situation the Department of Health will tolerate for its employees.* But to this date, nothing has been done to supply staff members with any relief.

Because the Department refused to resolve this matter, in order to relieve the undue suffering and mental stress of employees, the chair and telephone was removed from the credenza next to Ms. Evans' desk. *Now removal of a chair that could have easily been replaced by simply placing the missing chair is now a program issue.*

10.15.04
Page 2

Mr. Buford
From AFGEL2978 Regarding Workplace Violence

*The Department left us no alternative but to try to do something that would give relief to affected employees.* This chair was actually placed there by Ms. Evans herself long before Mr. Heath decided to move Mr. Jackson to the 9th floor. He responded to the requests of direct assignees that refused to come to work if Mr. Jackson's workplace was still located on their floor.

We are positive that if Mr. Heath had used good judgment, met with employees to discuss the problem and solicited their opinions, an amenable solution could have been agreed upon. But he did not do this because he is protecting Mr. Jackson and condones his behavior.

Instead of handling this situation appropriately, Mr. Jackson was moved to the 9th floor where female staff were also located and who feel just as threatened by his behavior as those on the 7th floor. This was not a viable solution since it did not resolve the pressing issue. DPM regulations were ignored by not following Chapter 16's (1617.1, 2, 3 & 4) guidelines for summary removal which states:

1617.1    An agency head may remove an employee summarily when the employee's conduct:

a)    Threatens the integrity of government operations;
b)    Constitutes an immediate hazard to the agency, to other District employees, or
c)    Is detrimental to public health, safety, or welfare.

1617.2    An employee who is notified by written or oral directive of a summary removal from his or her position pursuant to this section shall immediately leave his or her duty station and/or District government facility.

None of this happened. In fact, Mr. Jackson was placed on Administrative Leave and given a two (2) week vacation.

* Now, Colleen Crowley, Assistant Program Manager [federal direct assignee, CDC] recently hired by John Heath asked me to return a chair back to it's original space so Mr. Jackson can perform his duties on Tuesday, 01/13/04. [*He is not coming to work because he does not have a chair to sit on to do his job.*] She also asked Ms. Evans, Administrative Officer to give her the master key so she could enter the union office to retrieve a chair. *This would have been a BIG mistake which the Department would have been held accountable.*

We feel priorities are misplaced concerning employee safety. We also feel, if indeed, Mr. Jackson is not coming to work because of his need to have a chair, he has in fact abandoned his position and there are DPM regulations on how to handle this type of employee insubordination.

• We do not understand Ms. Crowley's interference in Union business. She is not within our chain of command, nor is she even aware of the situation in order to make intelligent reasonable request. Therefore, we are asking that you intercede in order to prevent any additional problems that will definitely arise if this situation continues in this manner.

Page 3

Mr. Buford                                                          10.15.04

I will not be subjected to levels of management involvement that are not legally accountable or capable of addressing Union issues. Please inform management [Dr. Berry, Bureau Chief and John Heath, Program Manager, STD] the appropriate manner in which to handle this situation.

We await your immediate response. If you, the Department, choose to ignore this issue, as it has in the past, it will leave us no alternative but to seek legal remedies immediately. Therefore we are requesting an immediate response to this correspondence. If for some reason, you cannot respond, please contact me ASAP so we will not await a response.


Sincerely yours,



JoAnn McCarthy
President


Attachment: Memo from C.Crowley, Assistant Program Manager, Regarding Removal of Chair


Cc: A.Willliams, J.Williams, E.Bunn



**American Federation of Government Employees**
**Local 2978 – District 14**
*Affiliated with AFL/CIO*
**District of Columbia Government**
**Department of Health**



717 14th Street NW
Suite 950~Box 14
Washington, DC 20005
Phone
202.727.9854/65
Fax 202.727.4934
Email
anicejo@hotmail.com

JoAnn McCarthy
*President*

Mary A. Brawner
*Advisor to the President*

Deidre Sparrow
*Vice President*

Deontrinese Henderson
*Chief Shop Steward*

Ida Shade
*Treasurer*

Jennifer M. Johnson
*Secretary*

Andrea Champ
*Sergeant of Arms*

Yvonne Jackson
*Fair Practice Coordinator*

Andrea Champ
*Women's Coordinator*

*Delegates*
Deidre Sparrow
Yvonne Jackson
Jennifer Johnson
Deontrinese Henderson

*Administrations
Represented*

Environmental Health
Public Health Laboratory
Lead Poisoning
Prevention

*Maternal & Child Health*

*Nutrition Programs*
(CSFP) & (WIC)

*Preventive Health
Services*
Chronic Disease
Communicable Disease
Epidemiology & Health
Risk Assessment

December 31, 2003

Honorable Anthony A. Williams
Mayor
District of Columbia
1350 Pennsylvania Avenue, N.W.
Washington, DC 20005

Dear Mayor Williams:

As a representative for some of my union members in Local 2978, that are located within the Bureau of Communicable Diseases, STD Control Program, Administrative Office, located at 717 14th Street, N.W., Room 950, I would like to again request an investigation into the potential for work place violence. It is my understanding that one complaint of fear of workplace violence is sufficient to warrant an investigation on the part of management, whether the threat is perceived or has actually taken place verbally or physically. Previously, I e-mailed your office regarding the Department of Health's (the Department) refusal to address this matter seriously explaining that employee safety and well being was not a priority with the District of Columbia Government.

Based on my contacting the Office of Risk Management, John Dougan and Sandra Marley made an impromptu site visit to interview female employees who felt threatened by a male employee's behavior. ORM requested the Department to conduct an investigation which did not take place. Mr. Dougan found out during a subsequent call from me that this investigation did not take place. On October 10, 2003, ORM had to issue an Occupational Safety and Health Alert Notice due to the failure of the Department to conduct this investigation thereby forcing one.

-2-

ORM's recommendation was to investigate fully the complaints coming from our STD's Administrative Office. November 17th employees at STD Control's Administrative Offices were told they were requested to speak with representatives from the Director's office about their positions and related concerns. These interviews were broken down into days. Some of the staff members were asked about Mr. Dale Jackson, Motor Vehicle Driver who was the male staff member exhibiting threatening and ill rational behavior, along with questions about their working conditions. (Mr. Jackson's behavior has been an issue here as well as the sites he visits to pick up reports, such as Howard University, Planned Parenthood and also at our own payroll office, where he frightened payroll staff in reference to his leave status (Ms. Ross and Ms. Brown).

A request for an investigation is being made again to your office, because nothing has changed from our request to the Risk Management Team, with the exception of the interviews done by Dr. Phyllis Mayor, Chief of Staff for DOH, Julian K. Tolver, Risk Manager and Tracy Martin, Program Analyst for Health Promotion, referred to as Management Investigation Team (MIT). Dr. Phyllis Mayo served as team leader.

The information given to the MIT from the STD Control employees about the potential for work place violence was basically dismissed by MIT as being erroneous statements on our part. Even after we informed MIT that Mr. Jackson was not disciplined during his first episode of violence in the workplace, MIT went on to say that he was disciplined. Now an anonymous letter that was sent to the Inspector General's office has been breeched and given to Mr. Jackson, concerning the possibility of him committing fraud by working at the DC Government as an MVO and working during the same hours at another job. While this was submitted to be investigated by the Inspector General's office, Management was conspiring together to protect him by any means. Even to the point of pointing the finger at the accusers saying that it was all erroneous and of coming to a conclusion that should have been done by the Inspector General's Office which claims assurance of privacy and confidentiality in reporting waste, fraud and abuse.

-3-

* At this point, it seems that the Senior Managers at the Department of Health are trying to cover up something, I just don't know what.  If we could get an honest investigation from unbiased individuals for the employees at the STD Control Program, I would be most grateful.

I am enclosing some of the correspondence from that Investigation conducted by the MIT.  Documents that personally attacked my position as Union President, my integrity, my professionalism and my efforts to protect and represent AFGE Local 2978's members have not been included.  I question the purpose of these documents inclusion into this report because they are irrelevant to this issue and my legal representative has been contacted. Further communication forthcoming regarding this issue.

If you require additional information, please feel free to have a member of your staff contact me on 727-9865 or Union Office number, 727-9854.

Sincerely,


JoAnn McCarthy
President

December 30, 2003

Honorable Anthony A. Williams, Mayor
District of Columbia Government
1350 Pennsylvania Avenue NW
Washington, DC  20005

Dear Honorable Mayor Williams:

I am profoundly astounded by the conduct of managers, hired to head agencies that deliver crucial services, like the Department of Health, [the Agency] who have been appointed by you as leader and caretaker of the District of Columbia. My experience working for the District of Columbia Government has been a disappointment like it has been for many of the employees I represent as President of the American Federation of Government Employees Local 2978.

Some of us worked long and hard to establish labor/management cooperation within the Agency but since Dr. Walks and Ms. Keitt left, it does not exist.  Everything has to be converted to a grievance or arbitration.  The Agency's record of grievances resolved, at this point, is probably reversed,  Where we had eighty percent (80%) of grievances resolved [closer to ninety-five (95%) for those who actually lived it] that figure probably has increased by twenty (20%) but only reversed. Now, its more like ninety-eight percent (98%) unresolved.  Partnership does not exist within the Department of Health.

I am a chartered member of DOH's Partnership Council and participated as the Labor Co-Chair along with Rosalind Keitt who was Management's Co-Chair. Our partnership started out with Labor and Management sitting across the table from each other into one you could not tell who was who. Only after we started talking about issues could you tell who was labor and who was management. But this was only because the head of the Agency actually bought into the partnership concept. He didn't give managers the options to not participant in an activity that would strengthen the Agency by strengthen labor/management relations.

Example #2: *Not all managers had their heart in it, like Rochetta Webb at Supplemental food who you could tell did not buy into the partnership concept by her body language and participation. You can tell Ms. Webb did not buy in by the way she handled our concerns about Miya Morales who is the community outreach worker at Adams Morgan. She did not have a working phone, no computer, no fax machine, no copier and at the charity of a private concern uses their equipment when needed. She even creates her own brochures and hand carries them to distribute them.*

*Instead of Ms. Webb correcting Ms. Morales situation, she ganged up on Ms. Morales [who by the way is Hispanic] with other individuals, frightening her more than she already was by asking her why she contacted the Union. One of our other members had been trying to persuade her to come to the Union with her concerns but she was afraid she would loose her job, just like a lot of the employees working for the Agency with various programs. Ms. Morales has received many, many, letters of accommodations from the clients she serves. She provides vital services to the Hispanic residents in Adams Morgan but Supplemental Food does not appreciate or award her for all her efforts. Just leaves her out there by herself without any real support. She does not deserve that. She deserves a deceit livable salary with benefits and all the tools/equipment she needs to perform her duties even more efficient than she already does without the proper materials.*

I stepped down from being Co-Chair after I realized that Dr. Walks' and Ms. Keitt's greatest fear in leaving the Agency was that it would revert back to the old adversarial ways of dealing with employee concerns and issues indeed did return. After all my years in trying to establish working cooperative relations within the Agency, to have it all dissipate so quickly, my heart is heavy.

*Example #2:  A public health advisor who was hired to perform as the foodborne coordinator.  This individual was terminated two (2) days before her probationary period was to end. She had the particular knowledge, qualifications and experience to perform these duties but because she raised an issue concerning the budget she was let go.  She was so happy when she found out she was to be offered this position.  She left District Service not understanding how someone committed to investigating and finding the source of  food borne pathogens could have been so mistreated, especially when she was versed in regulations and procedures concerning foodborne illnesses.*

*She was the Asian Pacific Islander the Agency used to meet your diversity criteria.  She was included in the Agency's report.  This individual also had her orientation approximately, two months before she was terminated.  I have not named her because we filed a grievance [which was ignored], invoked arbitration and settled before arbitration because the individual was too mentally stressed out.  Since she had never been terminated from a job before, she was devastated.  She was let go without cause all because she asked a simple question about where the check was for her equipment.  And as far as I know, no one has been hired to take her place.  She was let go at the same time President Bush declared war.  Makes you really wonder exactly what are our City's priorities.*

This is how qualified, knowledgeable, and committed employees to the District of Columbia Government are treated.  I think she was  discriminated  against but I  know  that's  illegal  and

representatives of the District of Columbia Government wouldn't conduct themselves in that manner.

In meeting the needs of residents and visitors, [individuals who provide these vital services], *the employees, are sexually harassed, unfairly treated, abused, retaliated against, denied career ladder/promotions, verbally/physically threatened, denied training [even training pertinent to the performance of their duties or certifications] while trying to perform the duties for which they were hired.*

As representative of our members, I instituted an investigation regarding the potential of workplace violence within the Bureau of STD Control Program, 717 14th Street NW ~ Suite 750 & 950. It is my understanding that one complaint of fear of workplace violence is sufficient to warrant an investigation on the part of management, whether the threat is perceived or has actually taken place verbally or physically.  I emailed you previously regarding the Agency's refusal to address this matter seriously explaining that employee safety and wellbeing was not a priority with the District Government particularly, the Department of Health [See Section , Page  of AFGE Booklet }.

Based on my contacting, the Office of Risk Management John Dougan and Sandra Marley made an impromptu site visit to interview female employees who felt threatened by a male employee's behavior. ORM requested the Agency to conduct an investigation which did not take place [See ORM DOH Investigation Section  of Booklet,m  Pages in Chronological order, please]. Mr. Dougan found out during a subsequent call from me, that this investigation did not take place. On October 10, 2003, ORM had to issue a Occupational Safety and Health Notice due to the failure of the Department to conduct this investigation thereby forcing one.

ORM's recommendation was to investigate fully the complaints coming from our offices located at 717 14th Street NW.    [Please Note:  When Risk Management sent the Department this Risk Alert, it inappropriately identified me as Support Staff member and not. as AFGE Local 2978's representative for affected employees.  This was done purposely and throughout this whole process I have not been identified as the individual who first raised this issue as it was raised on behalf of employees within the STD Control Program.]

The Agency was given until November 5, 2003 to respond to the Occupational Safety and Health Notice.  On November 3rd, Mr. Buford, [Agency Director who *you* appointed] responded by letter [See Page   of ORM Sec] stating after checking with several individuals, Dr. Karyn Berry, Chief, Bureau of Communicable Disease Control and Julien Tolver, DOH Risk Representative.  *The General consensus is there is a perceived and/or real threat of violence at the location.  He stated that Ron Lewis, Sr. Deputy Director [a friend of yours], Chief Operating Officer to work with Dr. Berry and Mr. Tolver in assembling a management investigation team to assess the situation, take immediate appropriate actions and provide follow-up recommendations to resolve the issues contributing to the situation.  They were given the whole month of November to provide a status report [by November 12th] and to submit a final report [two weeks later].*

★ On November 17, employees at STD Control's Administrative Offices were told they were requested to speak with representatives from the Director's office about their positions and related concerns.  These interviews were broken down into days.

🍂 *I was the only staff member to receive a written notice of my interview from my supervisor, Michelle Amar-Harried, a direct assignee from CDC. I was scheduled to meet in Dr. Phyllis Mayo, Chief of Staff's, office but met in Mr. Lewis' office with Mr. Tolver and a Ms. Martin [whom I've never met, did not know who she was or her vested interest into our concerns]. Dr. Mayo was not there for my interview.*

Staff members were asked about Dale Jackson, Motor Vehicle Driver who was the male staff member exhibiting threatening and ill rational behavior, along with questions about their working conditions.    [Mr. Jackson's behavior has been a issue here as well as the sites he visits to pick up reports, like Howard University and Planned Parenthood even at our own Payroll Office, Ms. Brown/Ms. Ross.]  Based on of the responses from staff members, Mr. Tolver decided that all employees from the STD Clinic should also be interviewed.

✱ Most employees from the Administrative Office told me that Dr. Mayo did not appear to really want to hear how they really felt. One employee told me, *she is not for us, she is political.* During the interviews that Dr. Mayo was part of employees said she tried to reword/change questions so that the answers would come out the way she wanted them to not the way they really were.  She also told employees that she did not want to hear anything that was over a year old.

Maybe we don't understand the position of Chief of Staff. I would think that this individual would be a cordial, understandable, well-rounded and intelligent person.    An individual who can speak with anyone no matter who they are, where they come from or their education background. Dr. Mayo does not exhibit these qualities and we wonder where she came from since we had no knowledge of her appointment, no introduction or notice of her joining our Agency.

➤ AFGE Local 2978's introduction to Dr. Mayo was a letter from her stating that our Union office was to be moved in two (2)

weeks to 2146 24th Place, NE. Of course this was a surprise and untimely. Not only was this timeframe short, but the location was in a building housing a treatment facility without one of our members working at this site. We then asked to meet with Dr. Mayo regarding the move.

♣ *This was our introduction to the new Chief of Staff who can not hold a candle to Rosiland Keitt who along with Dr. Walks should have been receiving a monetary award for all she did to foster and nourish labor/management relations and how valued she made employees feel during her short tenure..*

During this forced meeting, we found out that two (2) months prior to our original notice, the Agency was looking to relocate our Union office.



District of Columbia Government
# Office of Risk Management
### Risk Control Division

## Occupational Safety and Health Notice

October 10, 2003

Dr. Karyn Berry, Assistant Deputy Director
Department of Health
825 North Capitol Street, NE
4th Floor, Suite 4400
Washington, DC 20002

**OSH Risk: Potential Workplace Violence Exposure**
**Location: 717 14th Street, NW, 9th Floor**
**Date of Complaint Call: October 8, 2003**

Dear Dr. Berry

This is an Occupational Safety and Health Notice (OSHN-DOH-10-08-2003) to inform you of serious conditions related to fear of potential workplace violence at 717 14th Street, NW. Occupational Safety and Health Notices are issued when conditions require immediate attention by an Agency's Director and/or management staff.

**Background:**

This report is a follow-up to a call from a Department of Health employee to the Office of Risk Management, Risk Control Division, where OSHA complaints from the public sector are addressed. The complaint concerns fear of workplace violence, which is addressed by the Occupational Safety and Health Act of 1970, Section 5 (a)(1) , the General Duty Clause that states "every employer has the general duty to furnish each employee with employment and places of employment free from recognized hazards causing or likely to cause death or serious physical harm." (See also DC Code: 32.1103, (a) (1), 2001 Edition, Duties of employer and employees.) This report is also follow-up to a previous similar complaint received in August, which we understood as having been addressed by the Agency's management. Our office was informed following this recent call that the Agency was waiting for an investigation by the. Office of Risk Management.

**Methodology:**

Our investigation and interviews at 717 14th Street, NW were in no way an attempt to find fault with any parties in this complaint. As with any response to an Occupational Safety and Health complaint, the purpose was to determine if a hazard (or perceived hazard) exists and direct management to resolve any issues found. As a result a meeting was only held with the complainants, during which they were given an "open table" format to express their feelings. Some questions were asked for further clarification, as necessary.

Dr. Karyn Berry, Assistant Deputy Director
October 10, 2003
Page 2

**Observations:**
During the meeting and interviews held with the four staff members of the Department of Health located at the worksite, we found the employees under considerable stress and fear of workplace violence. As such, it must be noted that one complaint of fear of workplace violence is sufficient to warrant an investigation on the part of management, whether that threat is perceived or has actually taken place verbally or physically.

**Recommendation:**

OSHN-DOH-10-08-2003        It is recommended that the Agency investigate fully the complaints coming from the office located at 717 14th Street, NW. Fear of potential violence at the facility is evident. The issue of potential workplace violence whether perceived or actual, has also elevated stress levels (a health issue in itself) and must be resolved.

**NOTE**: The booklet, *Dealing with Workplace Violence a Guide for Agency Planners*, available from the U.S. Office of Personnel Management may prove useful in working with this issue. It is available at http://www.opm.gov/ehs/workplac/index.asp#handbook. Due to the nature of this complaint, investigation and any necessary corrective action may need to include input from agency management, personnel/human resources, legal, employee relations, and possibly protective services. Counseling resources may also need to be obtained.

Please provide a response to this Occupational Safety and Health Notice by November 5, 2003. The response should include actions taken or planned and completion dates or estimated completion dates. You may also include any disagreement with the recommendations given in this document.

Should you have any questions in regards to this Notice, please feel free to call our office.

Sincerely,

John J. Dougan, ARM, ALCM
Assistant Director

Cc:    James Buford, Director
       John Heath, Program Manager
       Ronald Lewis, Chief Operating Officer, Director's Office
       Sandra Marley, Risk Management Specialist
       JoAnn McCarthy, Support Staff
       Dr. Michael Richardson, Medical Director, Medical Affairs
       Julian Tolver, Agency Risk Management Representative

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**DEPARTMENT OF HEALTH**

★ ★ ★

Office of the Director

November 3, 2003

John J. Dougan, ARM, ALCM
Assistant Director
D.C. Office of Risk Management
Risk Control Division
441 4th St. NW, Suite 800S
Washington, D.C. 20002

Dear Mr. Dougan:

This is in response to your October 10, 2003 letter to Dr. Karyn Berry regarding your findings and recommendations on the workplace situation on the 9th Floor of 717 14th St. NW. After reviewing your letter, I have obtained additional information from Dr. Berry, who manages the staff at the referenced location, and received some general recommendations from Julian Tolver, Department of Health (DOH) Risk Representative. The general consensus is there is a perceived and/or real threat of violence at the location. Whether perceived or real, this is not a situation the Department of Health will tolerate for its employees.

I am asking Mr. Ronald Lewis, DOH Chief Operating Officer, to work with Dr. Berry and Mr. Tolver to assemble a management investigation team to assess the situation, take immediate appropriate actions, and provide follow-up recommendations to resolve the issues contributing to the situation. I am requesting that the team start the week of November 3, 2003, provide a status report by November 12th, and submit a final report within the following two weeks.

Please feel free to contact Mr. Tolver at 202-997-5209 or Mr. Lewis at 202 442-5999.

Sincerely,

James A. Buford
Director

CC:    Ronald Lewis, DOH
       Phyllis Mayo, DOH
       Dr. Karyn Berry, MD, DOH
       John Health, DOH
       Julian Tolver, DOH
       Sandra Marley, DCORM

Dr. Karyn Berry, Assistant Deputy Director
October 10, 2003
Page 2

**Observations:**

During the meeting and interviews held with the four staff members of the Department of Health located at the worksite, we found the employees under considerable stress and fear of workplace violence. As such, it must be noted that one complaint of fear of workplace violence is sufficient to warrant an investigation on the part of management, whether that threat is perceived or has actually taken place verbally or physically.

**Recommendation:**

OSHN-DOH-10-08-2003     It is recommended that the Agency investigate fully the complaints coming from the office located at 717 14th Street, NW. Fear of potential violence at the facility is evident. The issue of potential workplace violence whether perceived or actual, has also elevated stress levels (a health issue in itself) and must be resolved.

**NOTE:** The booklet, *Dealing with Workplace Violence a Guide for Agency Planners*, available from the U.S. Office of Personnel Management may prove useful in working with this issue. It is available at http://www.opm.gov/ehs/workplac/index.asp#handbook. Due to the nature of this complaint, investigation and any necessary corrective action may need to include input from agency management, personnel/human resources, legal, employee relations, and possibly protective services. Counseling resources may also need to be obtained.

Please provide a response to this Occupational Safety and Health Notice by November 5, 2003. The response should include actions taken or planned and completion dates or estimated completion dates. You may also include any disagreement with the recommendations given in this document.

Should you have any questions in regards to this Notice, please feel free to call our office.

Sincerely,

John. J. Dougan, ARM, ALCM
Assistant Director


Cc:    James Buford, Director
       John Heath, Program Manager
       Ronald Lewis, Chief Operating Officer, Director's Office
       Sandra Marley, Risk Management Specialist
       JoAnn McCarthy, Support Staff
       Dr. Michael Richardson, Medical Director, Medical Affairs
       Julian Tolver, Agency Risk Management Representative

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF HEALTH

★ ★ ★

Office of the Director

November 3, 2003

John J. Dougan, ARM, ALCM
Assistant Director
D.C. Office of Risk Management
Risk Control Division
441 4th St. NW, Suite 800S
Washington, D.C. 20002

Dear Mr. Dougan:

This is in response to your October 10, 2003 letter to Dr. Karyn Berry regarding your findings and recommendations on the workplace situation on the 9th Floor of 717 14th St. NW. After reviewing your letter, I have obtained additional information from Dr. Berry, who manages the staff at the referenced location, and received some general recommendations from Julian Tolver, Department of Health (DOH) Risk Representative. The general consensus is there is a perceived and/or real threat of violence at the location. Whether perceived or real, this is not a situation the Department of Health will tolerate for its employees.

I am asking Mr. Ronald Lewis, DOH Chief Operating Officer, to work with Dr. Berry and Mr. Tolver to assemble a management investigation team to assess the situation, take immediate appropriate actions, and provide follow-up recommendations to resolve the issues contributing to the situation. I am requesting that the team start the week of November 3, 2003, provide a status report by November 12th, and submit a final report within the following two weeks.

Please feel free to contact Mr. Tolver at 202-997-5209 or Mr. Lewis at 202 442-5999.

Sincerely,

James A. Buford
Director

CC:    Ronald Lewis, DOH
       Phyllis Mayo, DOH
       Dr. Karyn Berry, MD, DOH
       John Health, DOH
       Julian Tolver, DOH
       Sandra Marley, DCORM

3

language used by the staff person engaged in the phone conversation included phases such as, "They don't know who they messing with" and "I know they are behind the letter sent to the IG". The staff person (Mr. J.) who was speaking on the cell phone did not speak directly to the staff person (Ms. E.) who claims to have been intimidated. The staff member (Ms. E.) who claims to have been intimidated speculated that the incident she witnessed was in response to an anonymous letter, which had been sent to the D.C. Office of the Inspector General on October 3, 2003 alleging threatening behavior and professional misconduct against the other staff person (Mr. J.).

b) The staff member (Mr. J.) alleged to have demonstrated the above referenced intimidating behavior shared during his interview with MIT that he believes that the staff member (Ms. E.) making the above allegations sent an anonymous letter to the D.C. Office of the Inspector General making claims against him. The letter contained a great deal of erroneous information that seemed to be based on negative feelings on the part of the author.

c) Staff members (Ms. U. and Ms. B.) who were hired in this office since October, 2001 and do not have first-hand information about a verbally provocative incident which occurred two years ago time, indicate that they have been told by some of their co-workers to stay away from another staff member (Mr. J.) because "he was dangerous and had threatened another staff member in the past." Although this represents hearsay, it continues to contribute to an unhealthy work environment, fosters possible misinterpretation of behavior, and perpetuates feelings of unrest and possible intimidation.

d) Interviews revealed that arguments and hostility occur between staff too frequently at the STD administrative office. Many staff believe that this contributes to unhealthy working conditions, low morale and, frequent absenteeism among non-supervisory personnel.



e) During interviews with supervisory personnel, several of them stated concerns about Union Local #2978- 4th District office located on the 9th floor of the STD administrative office. They further stated that their concerns are related to (1) the Union President's interference with supervision of non-supervisory personnel, and (2) repeated altercations, some often hostile, between supervisors and the Union President. Written documentation has been received by MIT from several supervisors regarding this matter (See attachment C).



• "Us against them" attitude (District employees vs. Federal employees) prevents sense of cohesiveness, rather perpetuates splintered functioning, tense and sometimes hostile work environment.



Evidence Include:
a) Concern was verbalized about perceived discrepancies, which exist between the Federal and District employees assigned to this office. District employees feel that there are more opportunities for professional advancement for the Federal employees; they expressed concern that the grades are higher for the Federal staff and many resent being supervised by Federal employees. This "us against them" attitude seems to be quite

October 3, 2003

Mr. Charles Maddox, Esq.
Office of the Inspector General
District of Columbia Government
717 14th Street NW
Washington, DC   20005

Dear Mr. Maddox:

Because of the manner in which the majority of the workforce is treated within the District of Columbia Government, particularly within the Department of Health, I am reporting behavior that I feel constitutes fraud and waste.    These actions took place within the Preventative Services Administration, Bureau of Sexually Transmitted Disease Control Program [717 14th Street, NW~Suites 750 & 950] under the supervision of John T. Heath, Program Manager, GS 14/10, Federal Direct Assignee from CDC.



Dale Jackson's, [Motor Vehicle Driver, DS 6] principle duty is to pick-up and deliver lab reports from various medical facilities. He also is to deliver or pick-up mail. He has the use of a District vehicle for the whole day. While he was supposed to be working, he was attending mortuary school and since has received his license. How is it possible for an employee to attend school and get paid to perform the work he was hired to do?  If his schooling was related to his job or if it was approved through official channels, that's one thing. *But if he was allowed to go to school and still was getting paid as though he was performing the duties he was hired for, to me, that constitutes fraud.*   He now has two (2) jobs within one eight hour period.  His MVO job and his mortuary job. Can we all do the same?  If we can, please let me know.  We would all like an opportunity to attend school to enhance our livelihoods.  But we have not been given the same opportunity as Mr. Jackson. He has even been afforded a promotion when others did not.

Even though Mr. Jackson has a government issued cell phone and pager, he cannot be called by anyone but Mr. Heath.]  Dr. Karyn Berry, Division Chief for the Division of Communicable Diseases cannot call Mr. Jackson but she is aware of his behavior.  She cannot get him to do anything herself.  The administrative officer, Mrs. Evans cannot call Mr. Jackson.  She does not have his number.

On occasion, paperwork needs to be picked-up and delivered. Only Mr. Heath can make the request to Mr. Jackson.  Mr. Jackson would get angry, state not to call him and that he would not do as requested.  Mr. Jackson demonstrated violent behavior towards a female employee, LaJuan Lockerman and was put on administrative leave for two (2) weeks.  Mr. Jackson came back into the office approximately around 11:00 am just to threaten Mrs. Lockerman.  [Other employees have been suspended for lesser, chumped-up charges.]

Because of Mr. Jackson's behavior, his workplace was moved from the 7th floor to the 9th floor.  Not because of his violent behavior towards Mrs. Lockerman, but because federal direct assignees were stating they would refuse to come to work if he was not removed.  I guess this was to alleviate the problem but instead, all it did was have the female employees on the 9th floor fearful of his behavior. His keys to the offices were supposed to have been confiscated, per Mr. Heath, but they were not. He still has access to the offices.  Employees' sense of security is gone on both floors. Yet Mr. Jackson receives positive evaluations.

Mr. Maddox,                              - 2 -                          October 3, 2003

My whole problem with this situation is that the Agency is aware of all this. Dr. Marlene Kelly was aware of it many years ago. I do not understand this. Our investigators do not have cell phones that are at their disposal 24-7 [Mr. Jackson does]. They go out into the field where they might have to enter places that are unsafe to communicate with contacts. I don't even know if they have cell phones. I was told they had to check them out at the beginning of the day and check them back in at the end. I don't understand this. If any employee needs a cell phone, it is an investigator who has to go into areas of the city that others don't. Who have to communicate with people with specific

★ behaviors. *But yet Mr. Jackson has a cell phone basically for calls from only one person officially and that is Mr. Heath. To me that constitutes waste. So the way it looks, our investigators safety and well being is not a priority.* I question:

★ 1). Why is Mr. Jackson given special privileges by Mr. Heath, Program Manager and Dr. Karyn Berry, Division Chief?

★ 2). Why did Mr. Heath and Dr. Berry defend Mr. Jackson when approached by the Office of Risk Management investigating his violent behavior preventing any further investigation.

★ 3). How is it that Mr. Jackson was hired for eight (8) hours of work, gets paid for eight (8) hours, but can also maintain another job at the same time for a private concern?

★ 4). Since the STD Program does not have its own budget and its major funding is through grants, how can the Agency allow this to happen?

★ *This document was written on the behalf of the District Government Employees within the STD Program who have not been promoted, are performing duties of higher graded positions, whose ceiling on advancement is a DS9, and who are not considered for supervisory positions. Supervisory positions are mostly performed by federal direct assignees. This leaves no slots for employees who work for the District of Columbia Government and are under the authority of the District of Columbia Government, while the federal direct assignees are not. Direct assignees are paid, submit leave slips [very rarely], disciplined and receive benefits under the authority of the Federal Government and are not under the jurisdiction of the District of Columbia Government. Mr. Buford cannot hire, fire or discipline federal direct assignees.*

*Sincerely,*

★ *Because of Mr. Jackson's behavior and the fact that he once made a statement that if anyone made him loose his job, he would kill them, I am not submitting this document with my identifying information. If you actually perform an investigation, you will find information herein factual and you should end up speaking to me through your investigation.*

Cc:  L. Cropp, S. Allen, V. Orange, J. Buford [sent to Mr. Buford only because he is the director of DOH and responsible for the action of DOH's management officials ~ he is non-responsive to workforce issues and has made little or no attempts to resolve them.]

4

pervasive and was expressed by all of the District employees in this office. It appears to be a very sensitive topic and evokes a great deal of negative emotion when discussed. There is also the feeling that the District employees should not be supervised by the Federal employees.

- **Poor communication and misinterpretation of the behavior of co-workers. There seems to also be evidence of possible projection of one's feelings onto other persons.**

Evidence include:

a) As has been previously stated there was a negative verbal interchange between two staff persons (Ms. L. and Mr. J.) of the STD program two years ago. One person (Ms. L.) is no longer with the agency of their own choosing and the other person (Mr. J.) continues to work at DOH within the STD program. The incident was dealt with and one of the persons (Mr. J.) involved was disciplined. As a result of that situation he (Mr. J.) has assumed an aloof, no-nonsense approach to dealing with his co-workers. He interacts only with those with whom it is necessary to satisfactorily complete the responsibilities of his job. Otherwise, he does not speak to his co-workers, does not answer calls from them or engage in any conversation. He feels this is the best approach to avoid any misunderstanding or conflict. It appears that this behavior is being interpreted as hostile and intimidating. The employee (Mr. J.) in question is described by the Program Manager as a good employee who handles the responsibilities of his job effectively, and he is dependable and polite. Several managers and non-supervisory personnel continue to interpret this behavior as intimidating and hostile. However, it was noted by a senior level staff person, (Mr. S.) that many of the persons who are accusing the aforementioned individual of not speaking also engage in the same non-speaking behavior when addressed by others. There seems to be some negative feelings from a previous incident, which resurface with little, if any provocation.

stop

## IV. RECOMMENDATIONS

*Immediate Actions:*

- A DOH District government employee should supervise the Clerical Assistant/Typing staff and work closely with the Federal assignees supervisors. Presently all supervisory personnel of the program are federal assignees. Discipline of District employees (non-supervisory) has often been difficult because the Federal supervisors are prohibited from disciplining District government employees according to the District Personnel Manual (DPM). Recommendations for disciplinary action are referred to the Chief, Bureau of Communicable Disease Control for consideration and action.

- The Supervisory Medical Officer should have direct supervision of all personnel at the STD clinic, specifically the Disease Investigators who provide a clinical/disease surveillance function and are located at the STD clinic.

- Roles and responsibilities of all staff in the STD program need written clarification, and staff need to familiarize themselves with the responsibilities described in their position descriptions.

- DPM policies that regulate employee conduct should be distributed and explained to all employees by management. Employees should acknowledge their receipt and understanding of the policies through signature. These polices must also be enforced by DOH management.

- Both management and staff should receive training in the following:

  a) DPM policies and regulations regarding employee conduct
  b) Anger/Stress Management
  c) Conflict Resolution
  d) Effective Communication
  e) Professional Workplace Behavior
  f) Teamwork

STD management should identify resources and/or providers for the recommended training.

*Action that must occur within thirty (30) days:*

The Office of the Director will conduct a comprehensive assessment of the STD program to identify and address issues related to the following:

  a) Management and Staff relations
  b) Management Accountability
  c) Performance Standards
  d) Time and Attendance Policy
  e) Staff Position - Responsibilities and Compensation
  f) Physical layout, ergonomics and space allocation
  g) Inventory Control

Explore options for career development for clerical staff

## V. CONCLUSION

Based on interviews with all STD managerial and administrative personnel located at 717 14th Street, 7th and 9th floors, the MIT has determined that <u>evidence does suggest there are perceived hazards and some staff claim to believe that the potential for workplace violence exposure(s) exists.</u> Five out of 14 staff claims to believe the potential exists. It is important to note that these claims are based on an incident that occurred in October 2001 and behaviors that were adopted subsequent to that situation, as well as on apparently contentious interactions that reportedly occur frequently.

Please feel free to contact me at (202) 442-5999 if you have any questions.

Sincerely,

James A. Buford
Director

825 North Capitol Street, N.E. Washington, D.C. 20002 (202) 442-5999 FAX (202) 442-4788

May 5, 2005

AFGE District 14
Local #2978
80 F Street, NW
Eleventh Floor
Washington, D.C. 20001
Phone: (202) 639-6447

To Whom It May Concern:

This is a formal letter of complaint against Local Union #2978 D.C. Department of Health Medical Aides, presided over by Ms. JoAnn McCarthy to whom this letter of complaint is directed. As of last May I was temporarily assigned to another agency for 60 days according to an e-mail received by my supervisor from Ms. Monica Lamboy of the D.C. Department of Health due to complaints filed against me by District Government employees in the STD Control Program. During the investigation by Mr. Tolliver of the General Inspector's Risk Management Office and Dr. Mayo of the Mayor's Counsel, I was told that I was not the problem but felt that everyone involved could use a "cooling off" period. In other words, this was to be a temporary solution to an ongoing problem and all STD Program personnel received mandatory training regarding workplace violence. After 60 days I questioned my rights as a long term union paying employee as to how to return to my position at the STD Program and was informed by several members of the District Government's Human Rights office and D.C. Department of Health Administrators that this was a "union issue". After contacting the union formally for information and assistance, I never received a response and fairly certain that Ms. JoAnn McCarthy has deterred any union effort on my behalf because she was transferred from the STD Control offices permanently to UDC Student Health Center after the investigation. Ms. McCarthy repeatedly assists non-union personnel with complaints against Federal Managers because she knows who to contact for direction and seems to receive protection from any complaints filed against her due to her position as President of Local Union 2978. Quite often complaints against Ms. McCarthy are overlooked and the Department of Health refuses to take action to avoid dealing with the union.

I have continued to honor my assignment to another agency yet disturbed that I, a long time union member and dues payor have yet to receive any acknowledgement from this union on my behalf. At this point I feel that the National AFGE Headquarters Administration should be made aware of Ms. McCarthy's unprofessional behavior. I have received no help or advice as to how to go about solving my problem from this local union. Ms. McCarthy has been President of local Union 2978 for many years and became the subject of investigation during the investigation of complaints against me. It was mentioned on several occasions that if anyone reviewed my past evaluations compared to the employees that complained they would see that I do not have an absentee problem nor have I ever been sent on a temporary duty assignment before. I am enclosing documentation from my last evaluation and investigators' recommendations for your review. You can contact STD Control Program Managers regarding this case: Mr. John Heath, Program Manager, (202)727-9853; Ms. Michelle Amar, Ms. McCarthy's Supervisor and Surveillance Coordinator (202)727-6408 and my supervisor, Ms. Lyn Trotter, Infertility Prevention Project Coordinator, (202)727-9864. I would like to request assistance from someone with a more objective standpoint to review my case. A reply or referral for representation from your office within 30 days would be most appreciated. Thank you for your time.

Sincerely,

Dale Jackson, Local 2978 Union Member since 1988

GOVERNMENT OF THE DISTRICT OF COLUMBIA
**Department of Health**



DEPARTMENT OF HEALTH

Division of STD Control Program

## MEMORANDUM

**TO:**      Karyn L. Berry, M.D., M.P.H.

**THRU:**   John T. Heath, Program Manager

**FROM:**   Michelle D. Amar-Harried, Surveillance Coordinator

**SUBJECT:** Ms. McCarthy Disregard for Supervisory Request

**DATE:**   August 29, 2003

---

My authority to manage the staff assigned to the Surveillance Unit is being challenged daily by Ms. McCarthy, a Clerical Assistant. Ms. McCarthy behavior has deteriorated since receiving a satisfactory review for 2002. Ms. McCarthy during the review period of 2002 committed several acts of insubordination by refusing to meet with me that have not addressed. This practice of ignoring my request for explanation regarding request for leave or just simply failing to request leave at all has become very pronounced. Please review the following infraction of time and attendance that Ms. McCarthy has committed:

- On August 12, 2003 I received a leave slip requesting 40 hours of Administrative Leave. August 15, 2003 I wrote a memorandum requesting documentation supporting her request for the third time. Ms. McCarthy took leave without responding to my request.

- August 20, I requested in a memorandum an explanation from Ms. McCarthy's of the union business she was requesting 3 hours of administrative leave for on August 11, 2003. I received no response by August 27th as requested.

- August 25, 2003 Ms. McCarthy failed to report to work as scheduled. I received no request or phone call from Ms. McCarthy requesting leave. I requested an explanation in a memorandum dated August 26.

- August 26, Ms. McCarthy reported to work, then left at 9:50 am without notifying me. I requested an explanation in memorandum drafted on August 26.

- August 27, Ms. McCarthy failed to report to her workstation on the 7th floor all day. Ms. McCarthy failed to request approval from her immediate supervisor. I drafted a memorandum requesting an explanation on August 28, 2003.

---

The above infractions by Ms. McCarthy have challenged my ability to hold anyone in the Surveillance Unit accountable to me, a federal assignee, who has no apparent authority or support from the local management to follow through on my recommendation regarding performance or corrective discipline.     My ability to fulfill my duties as the Surveillance Coordinator has become increasingly difficult with the barriers to holding local staff accountable for the daily activities I am held accountable for completing in order to meet program objectives. I have supervised Ms. McCarthy for the past 6 years.  Ms. McCarthy has demonstrated this behavior of disregarding the authority of her immediate supervisor throughout my tenure as her supervisor.  Please see attachment (A) - memorandum dated January 23, 1998, which is my initial documentation of Ms. McCarthy's pattern of disregarding her accountability to me as her immediate supervisor.  It is also Ms. McCarthy's pattern deliberately disregard supervisory directives creating a forum for airing her opposition to having a federal supervisor.  Ms McCarthy has evaded from being held accountable by the intervene of high ranking union officer negotiating a resolution that consist of removing a charge of AWOL backed by a oral agreement to improved communication with her immediate supervisor. The incident document in attachment (A) included Ms. McCarthy agreement to seek assistance from Employee Assistance Program, which she failed to do.  EAP counselor informed me that Ms. McCarthy terminated services during her initial visit stated that she did not have any problems and she had no idea why she was there.

Ms. McCarthy's negative impact ranges from encouraging fellow clerical staff to by pass the chain of command for addressing issues and to seek resolution directly to problems such as payroll. I have overheard Ms. McCarthy promote violations in use of computers by encouraging downloading unauthorized programs, refusing to enter old morbidity, and frequently overtly threatening to file grievances against me, the Surveillance Coordinator.

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Department of Health**



Division of STD Control Program

## MEMORANDUM

**TO:**       **Mr. John Heath, Program Manager**

**FROM:**    **Michelle Amar-Harried, Surveillance Coordinator**

**SUBJECT:** **Report of Incident occurring October 21, 2002**

**DATE:**    **November 4, 2002**

---

Upon arriving to work on October 21, 2002, I pick-up the mail not processed Friday October 18, 2002. I dated stamped and placed the mail received into the appropriated inner office mail slots at 9:00am. The day had progressed without incident until 4.25pm.

Ms. JoAnn McCarthy, who had arrived to work between 12:00pm-1:00pm, began speaking out loud at 4:25pm" had anyone gotten the mail for the day." I responded by stating that I had processed the mail that morning and had placed it in the inner office mail slots. Ms. McCarthy continued her public display by announcing in the receptionist area, that she was expecting an important piece of mail. Without provocation Ms. McCarthy begins to yell at the top of her lungs at Ms. Stephanie Green, who was in my office, "where is the mail key"! Ms. McCarthy then proceed her outburst with the statement that "your need to quite fucking around in Michelle's office, and tell me where is the key." Ms. McCarthy continues to scream at the top of her lungs at Ms. Green while rummaging through Ms. Green's desk asking, "where is the key"! Ms. Green, who was on the phone, completed her phone conversation and proceeds to the receptionist area. Ms. Green responded to Ms. McCarthy, by requesting that Ms. McCarthy refrain from speaking to her in such a disrespectfully manner, and that she was not her child. When Ms. McCarthy could speak to her in a calm tone of voice, she would then answer her question. Ms. McCarthy then responded to Ms. Green, "You know how I feel about the mail". Ms. McCarthy public display disrupted the staff housed in Suite 750, including a visitor to Ms. Williams, the Training and Education Coordinator, at the time of the incident. At no time did Ms. McCarthy seek to address the issue to the acting Program Manager, Mr. Gonzalo Saenz, who was present and witness the display.

It is a well-known fact by Ms. Green and myself that mail is delivered late on Mondays. Mail delivered late on Monday is retrieved and processed on Tuesday, the next day. Ms. Green, the receptionist, is assigned to process mail with me serving as backup in Ms. Green's absence.

---

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Department of Health**



**DEPARTMENT OF HEALTH**

Division of STD Control Program

## MEMORANDUM

**TO:**     JoAnn McCarthy, Clerical Assistant

**FROM:**   Michelle Amar-Harried, Surveillance Coordinator

**SUBJECT:**  Letter of Direction

**DATE:**   October 22, 2002

The first point I would like to address with you is your behavior of screaming and using profanity towards a fellow co-worker, Mrs. Green, in the reception area on October 21, 2002, which is unacceptable and will not be tolerated. Under no circumstances is it acceptable to scream at the top of your lungs to communicate with anyone. Fellow-coworkers and a guest of Ms. Williams who happened to visiting at the time witnessed this unprofessional behavior. It is the right of each staff member assigned to Suite 750 to work in a hostile free environment. Any future concerns or complaints that you have are to be addressed utilizing the chain of command.

The second point is your use of the Division of STD Control address for delivery of your mail/bills is a responsibility that fall outside the venue of this office. Please contact all necessary parties to have your mail redirected to you elsewhere. The Division of STD Control will not be responsible for the management of personal mail routinely for its staff.

This is a Letter of Direction for the unprofessional public behavior you displayed to a fellow-coworker in the receptionist area that disrupted the environment for the staff assigned Suite 750. Notification of this matter will be forwarded to Program Manager, Mr. Heath.

The signatures below are an acknowledgement that this memorandum has been presented and discussed with me.

*Michelle D. Amar-Harried 10/25/02*
_____
Supervisor          Date

*Employee reported to work, but failed to*
_____
Employee            Date
*meet with me as requested by memoria*
*issued October 23, 2002*

*Shayala Suy  10/25/02*
_____
Witness             Date

cc: Mr. John Heath, Program Manager
    File

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Department of Health



October 29, 2002

Division of STD Control
717 14th Street NW, Suite 750
Washington, DC, 20002

Dear Ms. JoAnn McCarthy:

This is a 10-day advance notice of a proposal to suspend you without pay for 5 calendar days from your position of Clerical Assistant in the Division of STD Control. This action is proposed in accordance with the provisions of § 1-608 of the D.C. personnel regulations. The proposed action is based on a charge of Insubordination. The details in support of the proposed action are stated below:

On October 22, 2002, I requested to meet with you regarding your behavior on October 21, 2002. You requested union representation for the meeting. Based on the fact you were unable to find representation on October 22, 2002, I was advised by Personnel to rescheduling the meeting for October 25, 2002 at 9:00am. As instructed a memorandum rescheduling the meeting was placed in your office mail slot on October 23, 2002. Although you were present October 25, 2002 at 9:00am, you failed to meet with me as requested resulting in a charge of Insubordination.

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of this notice.

Your response, should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

Any response you prepare should be presented to Michael. Richardson. M.D, Sr. Deputy Director of Primary Care Prevention and Planning who will review this written notice and your response, if there is one, and issue a notice of final decision. Dr. Richardson is located at 825 North Capital Street, Washington DC and may be reached at 202-442-9035.

The material upon which the proposed action is based may be obtained from Darlene Mansfield located at 441 4th Street NW, Suite 34 North, Washington, D.C., 20001. You may arrange to review the material by contacting Darlene Mansfield at 202-442-9650.

Please be advised that you will remain in an active duty status during the period of advance notice.

Sincerely,

Michelle D. Amar-Harried, Proposing Official

---

825 North Capitol Street, N.E., Suite 4400, Washington, D.C. 20002  (202) 442-5999

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Department of Health**

Division of STD Control



**DEPARTMENT OF HEALTH**

Mr. Kofi Boakye, National Representative for District 14
American Federation of Government Employees, AFL-CIO
80 F Street, N.W.
Washington, D.C. 20001

July 23, 2002

Dear Sir:

The following is a formal complaint lodged against Ms. JoAnne McCarthy, Union President for Local 2978. JoAnne consistently yells to intimidate people, especially when she is defending herself from errant behavior. When I confronted her about bringing her grandson to our confidential office she literally flew off the handle and began verbally accosting me. I walked away the first time but stepped up to her abusive tone of voice the second time refusing to back down and defend myself from her verbal assault until she reared her hand back as if to slap me and cursed at me to end it. She has consistently created a hostile work environment by abusing her position as Union President with candid discussions regarding union business against Federal employees on her business phone in the open 7th floor office within earshot of all the Federal workers rather than using her personally assigned Union office upstairs on the 9th floor. We have chosen to ignore that and go about our business to complete reports.

JoAnne initiates debates over persistent protests about anything from the fax machine to the file cabinets stored in the back closet. Her constant absenteeism is relegated not resented by this office. When she comes to work, she creates an atmosphere of tension and incites dissension among local employees within her presence by addressing perceived and alleged injustices within the offices. She continuously exemplifies poor work habits and offensive behavior by coming in late, leaving early, talking confrontationally as well as not contributing to any of the work necessary for this unit to operate efficiently. It has been so long since she participated with any assigned work that she no longer understands current procedures in processing lab reports and refuses to take direction from anyone claiming that she's been here longer and knows what she's doing. She lacks credibility and respect from her co-workers and has lost the ability to effectively represent this office competently. She is regarded as a nuisance to our work environment with her constant shouts of disapproval of policies and procedures and protests of Federal workers within this unit, which diminishes progress and output.

For the record, Ms. McCarthy works in an office occupied by six Federal employees. Her behavior and offensive disposition not only reflects disapprovingly on the Union as a Local Union President but also creates a pathetic sense of sympathy for the employees that she has been chosen to represent. She has a tendency to create conflicts not resolve them. She boasts of

perceived powers and authority granted to her by the Union that does not exist. I implore you as her Union Supervisor to counsel her or release her from her union duties based on her unethical and pushy behavior within the STD Offices and the lack of constructive representation that she fails to demonstrate for her constituents.

This is a detailed description of an incident that took place Monday June 24, 2002 in my own words as I recall. Ms. JoAnne McCarthy came to the office of the Division of STD Control 7th floor offices that morning around 10:30 a.m. She had her grandson, Antwon with her. While she was speaking on the phone, Antwon began running up and down the hall of the office and into my office claiming that he was "back" and asking me how to play on my computer and if he could play with a necklace that was hanging on my bulletin board. I escorted him to JoAnne's desk where she was on the phone and waited for her to acknowledge my presence at the side of her desk. When she looked up I told her that I had heard that it was illegal and against regulations to bring a child into our confidential offices. Rather than put the phone on hold, she proceeded to fiercely convey that she hardly ever brought Antwon to work and that he wasn't hurting anybody. I again stated that I heard it was illegal to bring her kid into the workplace and that I would call Dr. (Karyn) Berry, Assistant Deputy Director, if I had to and walked back to my office. I then went to Mr. Gonzalo Saenz's office, Acting Chief and told him if he didn't do something about JoAnne's grandson that I was going to call Dr. Berry because I was not going to baby sit him all day. Gonzalo asked me if he was bothering me and I told him that he was running up and down the hall and had been in my office. He told me not to call Dr. Berry that he would to take care of it and I returned to my office.

JoAnne proceeded to leave the 7th floor leaving her grandson unattended. When she returned to the office she began to yell at her supervisor in the receiving area, Ms. Michelle Amar-Harried that she needed to tell me some things. After hearing my name clearly from the middle of the open area of the office, I went to the front to see what she was yelling at Michelle about and told JoAnne that if she had something to say to me then she could say it to my face. She stuck her hand up towards me and continued to yell at Michelle rather than acknowledge my presence. Michelle was calmly repeating to JoAnne that she needed to report to Gonzalo's office immediately. While JoAnne continued to rant on about what Michelle needed to say to me, I stepped in between her and Michelle to tell her again that if she had something to say to me that she needed to tell me and not Michelle. She continued to verbally accost Michelle until I asked her if she was going to hit me like she hit Michelle Joe, her former supervisor, because she began to step closer to me and get in my face.

When she began walking down the hall to Gonzalo's office, she told me that her grandson was none of my business and I told her that when she brings him to my place of work that it becomes my business because he's running around and in my office unsupervised. She stopped turned around and raised her hand as if she was going to slap me and then cursed at me. The Acting Chief, Gonzalo Saenz, dismissed her from the 7th floor for the rest of the day.

2

This incident escalated out of control. I will no longer tolerate her using my name as an excuse to verbally attack her supervisor. She shows up to the office not only 2 hours late but brings her grandson without her supervisor's consent and during the Program Manager's absence. I had a scheduled meeting at noon and did not want to be interrupted by an unsupervised child who was not supposed to be here in the first place. JoAnne has admittedly brought Antwon to work before and I have been tolerant of previous visits. Monday, her grandson was a menace and out of control and she was on the phone not bothering to tell him to stop running up and down the hall in front of her desk, which I tolerated until he proceeded to come into my office where I was entering confidential data reports. Not only is this a blatant disregard for the sensitive work that we are required to complete but she aggressively ignores repeated requests to supervise her child from several employees present that day including her supervisor.